# IN THE UNITED STATES DISTRICT COURT
# DISTRICT OF PUERTO RICO

| | |
|---|---|
| MICHAEL E. GUMPRECHT LLC, on behalf of itself and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>MICHAEL GROFF and WESLEY DECATUR,<br><br>Defendants. | Case No. <<Case Number>><br>CLASS ACTION |

# COMPLAINT
# (JURY TRIAL DEMANDED)

1.      SupplyBit LLC (Defendant in a related action pending in Illinois) is in the Bitcoin business. Bitcoin is a virtual currency created through a process called "mining," by which miners receive Bitcoin in exchange for solving math problems whose computational intensity increases and decreases in proportion to the number of other miners operating at the same time. SupplyBit sells to the public what it calls a "mining-services agreement," or MSA. Under the agreement, purchasers pay cash to SupplyBit in exchange for a specific amount of computing power, which is deployed to generate a specific amount of Bitcoin. But the mining-services agreement doesn't actually sell mining services, despite stating that it does. Instead, the agreement guarantees the purchaser the amount of Bitcoin that *would be* generated by deploying the purchased amount of computing power to mine Bitcoin given the computational intensity (called "mining difficulty") required by the network over the life of the contract. The agreement is, in other words, a straightforward security disguised to buyers as Bitcoin mining: In exchange for cash, SupplyBit gives purchasers financial exposure to the market price and mining difficulty of Bitcoin. SupplyBit never registered its securities under Illinois law.

2.      Plaintiff Michael E. Gumprecht LLC (Gumprecht) purchased two mining-services agreements with SupplyBit under the belief that both purchases were for mining electricity and mining equipment, not securities. On October 18, 2023, Gumprecht sued SupplyBit LLC and Defendants in Cook County Circuit Court in Illinois. On April 11, 2024, that Court dismissed Defendants for lack of personal jurisdiction.

3. Gumprecht, on behalf of itself and all others similarly situated, brings this Action for rescission or rescissory damages under the Illinois Security Act, alleging control-person and director liability against Michael Groff, SupplyBit's founder and CEO, and Wesley Decatur, a SupplyBit executive, who both actively participated in the sale of illegal securities to Gumprecht.

## Parties

4. Plaintiff Michael E. Gumprecht LLC is a limited-liability company formed under the laws of the State of Georgia and headquartered in Kennesaw, Georgia. The sole member of the LLC is Michael E. Gumprecht, who is a citizen and domiciled person of Georgia.

5. By information and belief, Michael Groff is the founder and CEO of SupplyBit. He is a resident of and domiciled in San Juan, Puerto Rico.

6. By information and belief, Wesley Decatur in the CFO of SupplyBit. He is a resident of and domiciled in Humacao, Puerto Rico.

## Jurisdiction and Venue

7. This Court has subject-matter jurisdiction over this Action under 28 U.S.C. § 1332 because both Defendants are residents of, and domiciled in, Puerto Rico; Plaintiff is an LLC headquartered in and formed under the laws of Georgia with a Georgia domiciliary as sole member; and because more than $75,000 is in controversy in this matter, exclusive of interest and costs. This Court further has subject matter jurisdiction over this action because it is a putative class action in which more than $5,000,000 is in controversy.

8. This Court may exercise general personal jurisdiction over Defendants because they are both domiciled in Puerto Rico.

9. Venue is proper in this Court under 28 U.S.C. § 1391(b)(1) because both Defendants are residents of, and domiciled in, Puerto Rico.

**Background on Bitcoin and Bitcoin Mining**

10. Bitcoin is a virtual currency—it serves as a store of value, a unit of account, and a means of exchange—but it is not issued by any government and lacks legal-tender status in every nation (except El Salvador, which declared Bitcoin legal tender in 2021). As of October 16, 2023 (the date the initial action in Illinois was filed), the total market capitalization of Bitcoin worldwide was approximately $530 billion, and one Bitcoin changed hands for approximately $28,613.

11. Bitcoin is created and maintained on a digital ledger called a "blockchain." To maintain a blockchain, a distributed network of computers uses a cryptographic function called a "hash" to validate a series of transactions (a "block") and connect it (in a way that is practically immutable) to all prior series of transactions (hence "chain").

12. The hash function used to validate blocks can vary in its computational intensity—that is to say, it can require more or less computing power to solve the hash function. The Bitcoin blockchain, then, operates by (a) awarding people Bitcoin in exchange for validating new blocks using a hash function, and (b) allowing the difficulty of the hash function to vary in response to the number of people attempting to validate new blocks such that it always takes approximately ten minutes for someone to successfully validate a new block. Although the network predictably

3

generates a new block in approximately ten minutes, the hash function can be solved (for practical purposes) only by trial and error, which means that the person who is awarded Bitcoin for mining each block is determined pseudo-randomly: People compete to solve the hash function first, and the winner is rewarded Bitcoin. This is the process called "mining."

13. The relevant unit of computing power on the Bitcoin network is called a "terahash," which is the power required to solve one trillion individual hash calculations in a second. The more terahashes one deploys on the network, the faster one will mine a block on average, and the more Bitcoin one will be rewarded on average. But as the price of and interest in Bitcoin exploded between the 2010's and the present, the computational power required to mine Bitcoin exploded too. And, as a result, the odds that a given miner—even one deploying hundreds of terahashes—will win a block are very low. For this reason, almost all serious Bitcoin miners operate through mining pools, which are agreements that allow groups to pool their computing resources to share in the results of their mining operations.

14. The upshot of all of this is that the Bitcoin network creates a straightforward means to make money: Using electricity and computing hardware to generate terahashes, one can create Bitcoin inversely proportional to the mining difficulty of the Bitcoin network. And that creates US dollars proportional to the price of Bitcoin, which trades for cash on well-established markets all over the world. One terahash of computing power, then, has economic value dependent on mining

difficulty and Bitcoin price, and the cost of a terahash of computing power depends on the price of electricity and efficiency of computing.

15. Starting around 2014, businesspeople realized that this economic relationship—cash invested in the Bitcoin network in exchange for a variable return on that cash—created an opportunity to profit from financialization. So they started selling "cloud mining" products. Purchasers of cloud mining products were entitled to a percentage of the returns generated from a centralized mining operation instead of operating computer equipment themselves. The SEC quickly caught on: Cloud mining clearly involves the investment of money in a common enterprise relying on the efforts of others for the expectation of profits, *see SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946), and thus constitutes a security, and so the SEC instituted several enforcement actions against cloud miners resulting in judgments against them, *e.g.*, *SEC v. Garza*, No. 15-CV-1760 (D. Conn. Dec. 1, 2015).

16. In response, some businesses created products called "hosted mining" services. Purchasers of hosted mining services effectively rented the computing power of *specific machines*, and the host deployed those machines to mine Bitcoin. The key economic distinction between hosted and cloud mining is that hosted-mining purchasers bear the risk that their specific equipment will fail or be destroyed. Hosted miners thus rely less on the efforts of others and more on the success of their own equipment, and they invest less in a common enterprise and more in a specific machine. This arrangement, so some thought, rendered the product less likely to be

considered a security under the *Howey* test. That, in turn, made it less likely to be subject to regulation under federal and state securities laws.

**<u>Defendants Sell Bitcoin Mining, Deliver Securities Instead</u>**

17. Defendants took cloud mining a step further in the direction of illegality.

18. According to SupplyBit's website, Groff founded SupplyBit in response to his own challenges starting a Bitcoin-mining operation. To mine Bitcoin, Groff realized, one had to select the right hardware; negotiate for a good price on electricity and on the physical space to operate the hardware, including the cooling capacity for it; join a complex mining pool; purchase appropriate insurance; and manage equipment when it failed. "There has to be an easier way," he thought, according to the website.

19. Groff called this easier way to mine Bitcoin "Hedge Mining." SupplyBit advertises Hedge Mining as "the easiest and safest way to mine Bitcoin . . . , provid[ing] [purchasers] all the benefits of mining for yourself, but without the risks." SupplyBit advertises to the public that "[t]he Supplybit Team strives to be an industry leader in mining and provide you with the most reliable and profitable mining solution possible." The website further advertises "100% uptime"; "Liquidity: the ability to sell your mine to third parties at your discretion"; and "Market insight: receive break-even analysis and mining difficulty updates."

20. One might wonder: how could someone possibly guarantee "100% uptime"? After all, computer equipment is made and operated by humans, who do not do anything 100% reliably. The answer is that Hedge Mining is not mining at all—it is a financial product, unbeknownst to those like Gumprecht who purchase the MSAs.

6

21. The mining-services agreement that SupplyBit offers to the public entitles purchasers to something it calls "Theoretical Earnings" in exchange for the "Purchase Price," which is defined as the product of the "mining power" purchased and the price per unit of power.[1] "Theoretical Earnings" is defined as 90% of the product of "the Single-Coin Aggregate Daily Hash [worth of mining power] for that day . . . expressed in Terahash and the average mining proceeds . . . on that day as determined by [a centralized website that keeps track of those proceeds]."

22. Although holding an MSA (that is, a mining-services agreement) also entitles holders to their share of actual proceeds generated by SupplyBit's mining operations, SupplyBit is never required by the contract to operate any specific mining equipment in any specific way. Indeed SupplyBit may fully comply with the agreements even if it never operates a single mine for itself. Under a provision SupplyBit refers to as "True Up," if SupplyBit's actual earnings from mining are lower than Theoretical Earnings, SupplyBit simply pays MSA holders the difference between the two (if there is one) every month. And because SupplyBit's mining operations are, as almost everyone's are, conducted through a pool, there is no chance that actual earnings will ever significantly exceed Theoretical Earnings (because if that happened, SupplyBit would owe the overage to the pool).

23. In fact, if mining difficulty and operational costs are high enough relative to the price of Bitcoin, the "break-even analysis" promised to SupplyBit

---

[1] The MSAs, by their own terms, are governed by Illinois law, per § 9.06 of the Agreements.

7

customers will dip into a loss. If that is the case, SupplyBit can profit by simply using customer funds to buy Bitcoin on the market and pay customers Bitcoin as "True Up" payments. In other words, the MSAs do not provide the purported mining services.

24. The agreements contain some other provisions unrelated to the core economic transaction they memorialize. For instance, under the agreements, purchasers can, if they wish, send SupplyBit their own computer equipment to be operated as a true hosted-mining service, but such a service is totally separate from any Hedged Mining purchased from SupplyBit (and, on information and belief, no purchaser has ever used SupplyBit's hosted mining service). And, under the agreements, purchasers may be able to direct their hash power to virtual currencies other than Bitcoin, but (a) no one has ever done that; (b) the agreements appear to define "cryptocurrency" to mean *only* Bitcoin, such that the choice of currency is illusory anyway; and (c) the economics of the Hedge Mining transaction would be the same with any other cryptocurrency that can be mined.

25. SupplyBit and Defendants are obviously selling securities disguised as mining, then: In exchange for an investment of money, purchasers are entitled to a common return based on the price and mining difficulty of Bitcoin—relying entirely on SupplyBit to do everything involved in producing and distributing that return— and SupplyBit specifically advertises this product as generating "profit[]." Indeed the MSAs are even less connected to the actual business of mining than the so-called "cloud mining" contracts of 2015, which the SEC ruled to be securities: The cloud-mining contracts entitled their purchasers to the proportional share of a large mining

pool, whereas the MSAs entitle their purchasers to nothing other than the average Bitcoin return generated by a given amount of terahashes over a specific period of time.

26. Groff and Decatur personally solicited Gumprecht's purchase of the MSAs during virtual meetings between Gumprecht and Groff on November 10, 2021, December 14, 2021, and September 21, 2022, and several email exchanges with Decatur, including a December 12, 2022, email (and one the prior year) in which Decatur confirms Gumprecht's purchase and sends him an invoice to "lock in" his purchase of the MSA. Groff also **personally** invited Gumprecht to tour SupplyBit, stating: *"Also, please let me know the next time you are in the Cleveland area, I'd love to give you a **personal** tour of our operation."* [emphasis added]

27. During these meetings, Groff made several representations and assurances that induced Gumprecht to enter into the MSAs. Of note, when Gumprecht specifically asked what SupplyBit would do if its mining operations halted inside the United States, Groff assured Gumprecht the mining would continue: *"Well, all that we do, then, is we just move to Canada or we move to Iceland or the Nordic nations. We have partners there that we've worked with. Now, granted, all of our operations are in the continental U.S., but we do have connections in those countries where we could redeploy if necessary."* [emphasis added]

28. Relying on Defendants' assurances, Gumprecht purchased his first MSA on December 30, 2021, and renewed by purchasing another on December 30, 2022. In

9

total, Gumprecht paid well more than $75,000 upfront in exchange for mining power to be deployed over two years.

### **SupplyBit Stops "Mining" and Stops Paying**

29. Each month from April 2022 until March 2023, the total amount of "mined" Bitcoin generally fell short of the Theoretical Earnings that should have been mined, thereby requiring SupplyBit to pay "True Up" amounts, which it did.

30. But in March 2023, SupplyBit abruptly ceased operations and Bitcoin payments. Groff wrote in a March 16, 2023, email to all SupplyBit investors:

> As you are no doubt aware, recent events at Silicon Valley Bank (SVB) have had repercussions throughout many industries, particularly ours. While we do not have funds at SVB, we have been caught up nonetheless through our relationship with Signature Bank, which was shut down this past Sunday, March 12. The uncertainty of our ability to transact in $USD in the coming days and weeks is beyond our control. Our investigation into the Signature Bank situation does not indicate that this uncertainty will be a permanent situation, but it is, however, currently and significantly impeding our ability to perform our necessary treasury functions as well as forecast the potential impact to our business operations. As such, we feel it is appropriate and necessary to declare a "force majeure" event starting today and suspend all existing mining services agreements (MSA) according to their terms.

31. Investors were, to say the least, displeased. For starters, a bank failure did not meet the MSA's force majeure clause, which defines a force majeure event as "any fire, strike, embargo, explosion, power failure, flood, lightning, war, water, electrical storm, labor dispute, civil disturbance, governmental requirement, act of civil or military authority, act of God, act of public enemies, or other cause beyond Supplybit's reasonable control, whether or not similar to the foregoing, that prevents

10

or significantly impedes Supplybit's performance of its obligations under this Agreement." SupplyBit was not even a Silicon Valley Bank customer. Instead, its force majeure declaration was, on information and belief, pretext: SupplyBit had in fact suffered a mining failure at one of its facilities and no longer wanted to honor its "True Up" obligations.

32.　As to Gumprecht, though, SupplyBit's behavior was even worse. Because Gumprecht completely paid upfront for all mining power and operating expenses, Decatur assured to Gumprecht in a phone call on March 25, 2023, that its force majeure declaration did not apply to him, and that it would continue to honor his contract on a one-on-one basis even as it suspended everyone else's. Decatur said: "I talked to our legal team, he's like, 'Yep, that seems like a pretty good pathway, and it seems to make sense.' We may be in a slight kind of a gray area here, but I think it's more important to take care of you in a way that works." (On information and belief, SupplyBit's other customers likely did not completely pay upfront.)

33.　Gumprecht expressed concern to Decatur that perhaps SupplyBit was only seeking to postpone a lawsuit from Gumprecht and would eventually stop performing after a few months. In response, Decatur said: "Understood, I wouldn't necessarily worry about that . . . . I think there's going to be a pretty good update in a month or two, which will be fairly surprising to everybody, but a very positive one."

34.　Gumprecht's fears were soon confirmed. SupplyBit continued paying Bitcoin for only two more months (April 2023 and May 2023), then completely stopped. To this day, SupplyBit continues to sit on all of Gumprecht's pre-paid funds.

## Plaintiff Learns That Illegal Securities Transactions Are Rescindable and Demands Rescission

35. On June 24, 2023, Gumprecht sent SupplyBit a letter demanding a refund. Gumprecht did not demand rescission under the Illinois Securities Act because Gumprecht had no idea either that the MSAs might be characterized as securities or that a transaction involving securities might be rescindable.

36. SupplyBit ignored Gumprecht's demand. On September 12, 2023, Gumprecht retained undersigned counsel at Gerstein Harrow. Gerstein Harrow is aware that sales of unregistered securities are rescindable under Illinois law, and so on September 27, 2023, Gumprecht, through counsel, elected to rescind the MSAs by offering to tender all of the Bitcoin SupplyBit delivered Gumprecht in exchange for all of the money Gumprecht delivered SupplyBit.

## Class Action Allegations

37. Plaintiffs will move to certify the following class: All people who were parties to an MSA with SupplyBit. Excluded from the class are SupplyBit; corporate officers, members of the boards of directors, and senior executives of SupplyBit; members of their immediate families and their legal representatives, heirs, successors or assigns; and any entity in which Defendants or SupplyBit have or had a controlling interest.

38. The proposed class meets Federal Rule of Civil Procedure 23(b)(3)'s requirements, called respectively numerosity, commonality, adequacy, and predominance and superiority.

*Numerosity*

39. The class is so large that joinder of all parties would be impracticable.

40. Based on information and belief, there are at least dozens, and possibly hundreds or thousands of holders purchasers of MSAs during the relevant time period. This satisfies the numerosity requirement.

*Commonality*

41. There are questions of law and fact common to members of the class, including, without limitation: whether the transaction constituted the illegal sale of securities.

*Typicality*

42. Gumprecht purchased two MSAs for value, even though Defendants did not register MSAs as a security. The claims of the named Plaintiff is, therefore, typical of—indeed, likely identical to—the claims of all the unnamed class members.

*Adequacy*

43. As explained above, the named Plaintiff's claims are identical to the claims of other class members, and there are no known conflicts of interest with any other class member.

44. The named Plaintiff will adequately protect the interests of absent class members.

45. Plaintiff proposes Gerstein Harrow, LLP, and Rivera-Aspinall, Garriga y Fernandini, PSC, as class counsel. Both founding partners of Gerstein Harrow have significant experience litigating complex cases and major class actions, including class actions involving crypto. Gerstein Harrow's attorneys are lead counsel to the

13

court-appointed lead Plaintiff in one other securities case involving cryptocurrency, *Houghton v. Leshner*, N.D. Cal. No. 22-cv-7781. Attorney Julian Rivera Aspinall from Rivera-Aspinall, Garriga y Fernandini, PSC, has decades of experience litigating in federal court in Puerto Rico.

*Predominance and Superiority*

46. Proceeding as a class would be appropriate here because common issues vastly predominate over individual ones, rendering a class action a superior way to proceed. Given the number of impacted parties and their similar claims, a class action is the best way to secure the economies of time, effort, and expense and promote a uniformity of decision, and it can serve equity and justice by providing a single forum for these essentially identical claims.

47. Finally, the class in this case will be easily managed and ascertained. Defendants should have records of all purchasers of MSAs during the relevant time period. And bitcoin transactions exist on a public blockchain, so they can be easily calculated and verified. Accordingly, customers, payments, and losses are all easily ascertainable, and the purchasers can easily be made whole through any judgment in this case.

**Claim for Relief**

**Count One: Control Person And Director Liability, 815 ILCS 5/13**

48. Gumprecht incorporates all prior paragraphs by reference here.

49. The MSA contract is a security because it is an investment contract under 815 ILCS 5/2.1. It represents the investment of money in a common enterprise with the expectation of profits reliant on the efforts of others.

50. The MSAs do not qualify for any exemption under 815 ILCS 5/3 and the transaction by which they were sold does not qualify for any exemption under 815 ILCS 5/4 because they were sold pursuant to a general advertising or general solicitation of the public.

51. The MSA's were never registered or qualified as securities in the State of Illinois or anywhere else, and SupplyBit never provided statutorily mandated disclosures.

52. Gumprecht and all members of the putative class are, therefore, entitled to rescind the MSAs or to rescissory damages if they no longer own the MSAs.

53. Under 815 ILCS 5/13(A), all "controlling persons" of securities violators are jointly and severally for the violations. Similarly, "officers and directors . . . who shall have participated or aided in making [a violative] sale" are jointly and severally liable for the violation.

54. Groff is a controlling person because, on information and belief, he owns interests in SupplyBit sufficient to control the entity; because he is the entity's CEO, founder, and principal officer; and because he personally sold the MSAs through, among other things, person-to-person solicitations and general advertisements.

55. Groff is, therefore, jointly and severally liable with SupplyBit and the other Defendants for rescission of the MSAs or rescissory damages.

56. Decatur is a director and officer of the company and he directly aided in making an illegal sale by, among other things, soliciting Gumprecht's purchase.

57. Decatur is, therefore, jointly and severally liable with SupplyBit and the other Defendants for rescission of the MSAs or rescissory damages.

## **Prayer for Relief**

Plaintiff Michael E. Gumprecht LLC respectfully requests:

- A jury trial on all issues so triable;
- An order appointing it lead Plaintiff and undersigned lead counsel and certifying the putative class;
- An order requiring rescission of the MSA contracts, with 10% interest on all amounts paid, or rescissory damages with 10% interest for class members who no longer own the MSAs;
- An award of reasonable costs and attorneys' fees incurred in prosecuting this action; and,
- All other relief this Court deems just and equitable.

Respectfully submitted,

Rivera Aspinall, Garriga
& Fernandini, PSC
Attorney for Plaintiffs
1647 Adams Street
Summit Hills,
San Juan, PR 00920

s/ Julian R. Rivera Aspinall
 Julian R. Rivera Aspinall, Esq.
USDC PR 208506
 aspinall@ragflaw.com
 (787) 792-8644

*/s/ Charles Gerstein*
Charles Gerstein (*pro hac vice* application forthcoming)
Gerstein Harrow LLP
1001 G Street NW, Suite 400E
Washington, DC 20001
charlie@gerstein-harrow.com
(202) 670-4809

*/s/ Jason Harrow*

Jason Harrow (*pro hac vice* application forthcoming)
Gerstein Harrow LLP
12100 Wilshire Blvd. Ste. 800
Los Angeles, CA 90025
jason@gerstein-harrow.com
(323) 744-5293