**In the United States District Court**
**For the District of Puerto Rico**

| | |
|---|---|
| MICHAEL E. GUMPRECHT, LLC, on behalf of itself and all others similarly situated,<br>*Plaintiff,*<br><br>v.<br><br>MICHAEL GROFF and WESLEY DECATUR,<br>*Defendants* | Cause No. 3:24-cv-01210-JAG<br><br>*putative class action* |

---

**Defendants' Response in Opposition to Plaintiff's Motion for Summary Judgment; and Defendants' Cross-Motion for Summary Judgment**

---

## Table of Contents

Table of Contents .......... 1

Table of Authorities .......... 3

Preliminary Statement .......... 6

Memorandum of Law .......... 7

Factual Background .......... 8

A. Gumprecht's "Purpose" was to mine for himself, not to invest in Supplybit's mining efforts. .......... 9

B. The MSAs granted Gumprecht broad, extensive control. .......... 9

C. Gumprecht received individualized, not pro-rata, returns. .......... 11

D. The Trade-In Miner process was integral to the MSAs. .......... 11

E. The True-Up did not impact Gumprecht's decisional rights. .......... 12

F. The parties performed until events intervened. .......... 12

Argument .......... 14

1. The MSAs are not investment contracts, so they are not securities. .......... 15

2. The substance of Supplybit's operations trumps the hypothetical form of business Gumprecht theorizes. .......... 16

2.1. Gumprecht repeatedly mischaracterizes the MSAs. .......... 17

2.2. The Trade-In Miner provisions alone entitle Defendants to summary judgment; the Court should reject Gumprecht's mischaracterization of the evidence. .......... 21

2.3. Gumprecht misrepresents the Luxor "pooling." .......... 23

3. Undisputed evidence refutes the theory that the MSAs were shams, so Defendants incorporate their prior briefing. .......... 24

4. Gumprecht's voluntary choice to remain passive is irrelevant. .......... 26

5. Even if the MSAs were securities, Decatur is entitled to summary judgment. .......... 28

6. Gumprecht's request for rescission is untimely as a matter of law. .......... 30

7. Gumprecht suffered no damage. His request for a windfall worth millions should be rejected. .......... 32

Conclusion .......... 33

Certificate of Service .......... 34

## Table of Authorities

**Cases**

*Ansbro v. Se. Energy Grp., Ltd.*,
658 F. Supp. 566 (N.D. Ill. 1987) ........ 31

*Asociacion de Suscripcion Conjunta del Seguro de Responsabilidad Obligatorio v. Juarbe-Jimenez*,
659 F.3d 42 (1st Cir. 2011) ........ 29

*Buehl v. Dayson*,
469 N.E.2d 403 (Ill. Ct. App. 1984) ........ 31

*Carlson v. Bear, Stearns & Co. Inc.*,
906 F.2d 315 (7th Cir. 1990) ........ 29

*Carney v. Union Pac. R. Co.*,
77 N.E.3d 1 (Ill. 2016) ........ 20

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ........ 8, 28

*Clark v. Lay*,
2022 IL App (4th) 220101 ........ 30

*Dettmering v. VBit Techs. Corp.*,
2023 WL 4824955 (D. Del. July 27, 2023) ........ 24

*Foxfield Villa Associates, LLC v. Robben*,
967 F.3d 1082 (10th Cir. 2020) ........ 26

*Frendreis v. Fin. Concepts, Ltd.*,
435 N.E.2d 1304 (Ill. Ct. App. 1982) ........ 31

*Froehlich v. Matz*,
417 N.E.2d 183 (Ill. App. Ct. 1981) ........ 29

*Garcia-Garcia v. Costco Wholesale Corp.*,
878 F.3d 411 (1st Cir. 2017) ........ 7

*Garmon v. Nat'l R.R. Passenger Corp.*,
844 F.3d 307 (1st Cir. 2016) ........ 25

*Goldberg v. 401 N. Wabash Venture LLC*,
755 F.3d 456 (7th Cir. 2014) ........ 16

*Goldfine v. Barack, Ferrazzano, Kirschbaum & Perlman*,
2014 IL 116362, 18 N.E.3d 884 .................... 33

*Harris v. Reston Hosp. Ctr., LLC*,
523 F. App'x 938 (4th Cir. 2013) .................... 28

*Integrated Rsch. Servs. v. Ill. Sec'y of State*,
765 N.E.2d 130 (Ill. Ct. App. 2002) .................... 16, 23, 27

*Keith v. Black Diamond Advisors, Inc.*,
48 F. Supp. 2d 326 (S.D.N.Y. 1999) .................... 26, 27

*Klemp v. Hergott Grp., Inc.*,
641 N.E.2d 957 (Ill. Ct. App. 1994) .................... 17

*Lawless v. Steward Health Care Sys., LLC*,
894 F.3d 9 (1st Cir. 2018) .................... 8

*Mid-W. Energy Consultants, Inc. v. Covenant Home, Inc.*,
815 N.E.2d 911 (Ill. Ct. App. 2004) .................... 19

*Nat. Life Ins. Co. v. Silver*,
1987 WL 5415 (N.D. Ill. Jan. 15, 1987) .................... 31

*People v. Hollins*,
2012 IL 112754 .................... 30

*Peterson v. Municipality of Luquillo*,
2024 WL 4476454 (D.P.R. Sept. 30, 2024) .................... 8, 19, 22, 23

*Portfolioscope, Inc. v. I-Flex Sols. Ltd.*,
473 F. Supp. 2d 252 (D. Mass. 2007) .................... 29

*Pyle v. Ferrel*,
12 Ill. 2d 547 (1958) .................... 30

*Ronnett v. Am. Breeding Herds, Inc.*,
464 N.E.2d 1201 (Ill. Ct. App. 1984) .................... 15

*Sanchez-Cardona v. Corp. Planners, Inc.*,
895 F. Supp. 26 (D.P.R. 1995) .................... 21

*Sears v. Kaufmann*,
1995 WL 513499 (N.D. Ill. Aug. 25, 1995) .................... 29

*SEC v. Merchant Capital, LLC*,
483 F.3d 747 (11th Cir. 2007) .................... 26

*SEC v. W.J. Howey Co.*,
328 U.S. 293 (1946) ........ 16, 21

*Summers v. Nyre*,
2025 IL App (1st) 241447-U ........ 31

*Sun Commodities, Inc. v. Island Fresh de Puerto Rico, Inc.*,
2024 WL 2300677 (D.P.R. May 21, 2024) ........ 18

*Tcherepnin v. Knight*,
389 U.S. 332 (1967) ........ 16

*Thompson v. Gordon*,
948 N.E.2d 39 (Ill. 2011) ........ 19, 20, 21

*Viscito v. Nat'l Plan. Corp.*,
34 F.4th 78 (1st Cir. 2022) ........ 7

*Wells Fargo, N.A. v. Nguyen*,
2024 IL App (3d) 230253 ........ 30

**Statutes**

815 ILCS 5/13 ........ 28, 30, 32, 33

815 ILCS 5/2.1 ........ 15

**Rules**

D.P.R. L.R. 7(e) ........ 6

Fed. R. Civ. P. 56 ........ 6

**Treatises**

INDEPENDENT CONTRACTOR, Black's Law Dictionary (12th ed. 2024) ........ 20

**Regulations**

SEC Statement on Certain Proof-of-Work Mining Activities (available at https://www.sec.gov/newsroom/speeches-statements/statement-certain-proof-work-mining-activities-032025) ........ 23

Come now the Defendants, through counsel, pursuant to Federal Rule of Civil Procedure 56, to respectfully request that the Court deny Plaintiff's motion for summary judgment, and instead grant summary judgment in full to the Defendants. In support, Defendants state as follows.[1]

**Preliminary Statement**

Michael E. Gumprecht, LLC's ("Gumprecht") motion for summary judgment makes a big ask. He wants the Court to rewrite the Mining Services Agreements he executed. By its terms—the only terms of the bargain because of an integration clause—his "Purpose" in entering into the MSA was *his own* "desire[] to engage in cryptocurrency mining and desire[] to purchase the capacity to mine cryptocurrencies." In line with his self-declared Purpose, the MSAs describe at length the control he had over his own fate: he could chose when to mine or to pause, depending on his reading of market conditions; he could choose which cryptocurrency to mine; he could find his own mining equipment and send it to Supplybit to supplement his mining power (the "Trade-In Miner" process). These individual decisions inured to his sole benefit. His Client Wallet went up or down based on his decisions, independently of any other Client's performance or Supplybit's overall performance.

To pursue a securities claim against Groff and Decatur (rather than a breach of contract claim against Supplybit)—and to seek a windfall worth millions of dollars—Gumprecht now says that when he executed the MSAs he had the opposite purpose of what he declared. He now says his purpose was to have

---

[1] Local Rule 7(e) grants Defendants 15 pages to respond to Plaintiff's motion, and 25 pages to make their own motion. The Court's current scheduling order allows for a combined response and cross-motion, which Defendants understand to mean 40 pages of briefing. Defendants are well under that limit.

*Supplybit* mine Bitcoin (and Bitcoin alone), while he would sit passively and receive returns. He further asks this Court to take the Trade-In Miner provisions of the MSAs—a concept that appears over *eighty* times in each MSA, and is intertwined throughout the contracts from beginning to end—and declare them "extraneous," "incidental," and "unrelated" to the contract containing them. Gumprecht does not cite a single case that would permit this Court to rewrite the MSAs in this way.

On this and many other topics, Gumprecht's case depends on this Court ruling that the MSAs say the opposite of what Gumprecht agreed. Illinois law forbids courts from rewriting contracts in this way, so summary judgment should instead be entered in Defendants' favor. In the alternative, Gumprecht's idiosyncratic reading of the MSAs—where he interprets them to have the opposite purpose and effect than what he declared in writing—presents a question of fact regarding the true, underlying economic reality of the MSAs.[2]

**Memorandum of Law**

"A grant of summary judgment is appropriate when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Viscito v. Nat'l Plan. Corp.*, 34 F.4th 78, 83 (1st Cir. 2022). "A genuine issue of fact exists where the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Garcia-Garcia v. Costco Wholesale Corp.*, 878 F.3d 411, 417 (1st Cir. 2017). "The court must examine the record in the light most favorable to the nonmovant and must make all reasonable inferences in that

[2] Both Defendants seek summary judgment because the MSAs are not "securities." Decatur separately moves because even if the MSAs are securities he cannot be liable because he did not participate or aid in the sale of the MSAs to Gumprecht.

party's favor." *Id.* (cleaned up). But "in doing so, it casts aside and ignores all 'conclusory allegations, improbable inferences, and unsupported speculation.'" *Peterson v. Municipality of Luquillo*, 2024 WL 4476454, at *1 (D.P.R. Sept. 30, 2024) (quoting *Garcia-Garcia*, 878 F.3d at 417).

"Where, as here, the parties cross-move for summary judgment, the court must [examine] each motion separately, drawing inferences against each movant in turn." *Lawless v. Steward Health Care Sys., LLC*, 894 F.3d 9, 20–21 (1st Cir. 2018). Gumprecht has to prove his case with undisputed evidence; the Defendants, however, should receive summary judgment if Gumprecht lacks evidence to support an element of his claim. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

## Factual Background

This case centers on two Mining Services Agreements, executed between Gumprecht and non-party Supplybit. DSUMF ¶ 1.[3] The two MSAs are nearly identical. *Id.* Neither Groff nor Decatur were parties to the MSAs. *Id.*

Gumprecht entered into the MSA after having the opportunity to consult with legal counsel. DSUMF ¶ 3. Mr. Gumprecht the individual is himself a licensed attorney. *Id.* He agreed the MSAs "constitutes the entire agreement between the Parties as to the subject matter described herein and supersedes any prior agreements, understandings, representations, warranties, and restrictions between the Parties that relate to such subject matter." DSUMF ¶ 4. He thus agreed that all of the marketing material and slide decks he has now designated on summary judgment are irrelevant to his agreement with Supplybit. *Id.*

---

[3] "CSMF" means Defendants' counterstatement of material facts. "DSUMF" means Defendants' statement of undisputed material facts.

### A. Gumprecht's "Purpose" was to mine for himself, not to invest in Supplybit's mining efforts.

Gumprecht declared his "Purpose" in entering into the MSAs. DSUMF ¶ 7. Gumprecht agreed that the primary "Purpose" of the MSA was *his*—not Supplybit's—efforts to mine cryptocurrency: "Client desires to engage in cryptocurrency mining and desires to purchase the capacity to mine cryptocurrency (the 'Purpose') from Supplybit." *Id.* Even though the word "investor" or "investment" appears roughly forty times in his statement of facts, Gumprecht did not consider himself an "investor" in Supplybit; he considered himself a "Client" purchasing a lease of computer power. DSUMF ¶ 5. He purchased "Mining Access Rights," the right to deploy Mining Power "toward the mining of one or more Cryptocurrencies." DSUMF ¶ 8. Gumprecht agreed that nothing in his agreement with Supplybit should ever "be construed to constitute or create a partnership, joint venture, agency, or formal business organization of any kind." DSUMF ¶ 2. Instead, he expected to be treated "for all purposes" as an "independent contractor[]." *Id.*

### B. The MSAs granted Gumprecht broad, extensive control.

Despite his recent attempt to claim the opposite—but consistent with his independent contractor status—the MSA granted Gumprecht powerful rights to control his financial fate, including most centrally "the right to instruct Supplybit to allocate up to the Current Max Mining Power toward the mining of such *Cryptocurrency or Cryptocurrencies as [Gumprecht] may select*." DSUMF ¶ 9. Gumprecht's briefing treats Supplybit as an entity that solely mines Bitcoin and distributes it—the unambiguous language of the MSAs refutes that notion. *Id.* Gumprecht had to use his own efforts and decision making to balance that

deployment right against his obligation to pay "Running Costs," the cost to run the equipment. DSUMF ¶ 10.

While the price of Bitcoin has generally increased between 2010 and 2025, its value sometimes goes down. DSUMF ¶ 19. In 2014, the value of Bitcoin went down by 61%. *Id.* In 2018, the value of Bitcoin went down by 73%. *Id.* In 2022, the value of Bitcoin went down by 64%. *Id.* Supplybit has no control over the price of Bitcoin or any other cryptocurrency. DSUMF ¶ 20.

If Bitcoin or any other cryptocurrency a Client was mining went down in value, it could make economic sense for a Client to pause their mining activity, thereby saving them from paying "Running Costs." DSUMF ¶ 21. Or, it could make economic sense for a Client to switch their mining activity from a cryptocurrency going down in value to a cryptocurrency going up in value. *Id.* The MSAs reserved these decisions for the Client, not Supplybit. *Id.*

Under the MSAs, Supplybit would respond to deployment decisions Gumprecht made, and would direct Gumprecht's individual proceeds to Gumprecht's individual Client Wallet. DSUMF ¶ 13. Gumprecht inaccurately claims that Clients simply received proceeds "in sizes corresponding to the amount of mining power each investor purchased," ECF No. 61 ¶ 35, but this statement assumes two Clients who have chosen to mine the same cryptocurrency. DSUMF ¶ 15. If two Clients leased an equal amount of mining power, but one instructed Supplybit to use it to mine a well-performing cryptocurrency and the other instructed Supplybit to use it to mine a poorly-performing cryptocurrency, the Client who chose to mine the well-performing cryptocurrency would receive more proceeds in terms of $USD. *Id.*

**C. Gumprecht received individualized, not pro-rata, returns.**

Supplybit did not pool Clients' individual returns. DSUMF ¶ 16. If two Clients made different individualized deployment decisions (one paused while the other mined, or one mined Bitcoin while another mined a different cryptocurrency), each Client would receive the proceeds from his own decisions. *Id.* Supplybit did not pool Clients' results, nor did Supplybit provide averaged or pro-rata returns to Clients. *Id.*

Nor did Supplybit pool Clients' returns with Supplybit's overall performance as a company. DSUMF ¶ 17. Nothing in the MSA promised Gumprecht more money if Supplybit as a whole had an especially profitable year. *Id.* Nothing in the MSA said Gumprecht would get less money if Supplybit as a whole operated with smaller margins or even at a loss. *Id.* The proceeds going to Gumprecht's individualized Client Wallet depended solely on Gumprecht's own performance, which in turn depended on his own decision-making. *Id.*

**D. The Trade-In Miner process was integral to the MSAs.**

Gumprecht also had the right to find, secure, and trade in his own computers to Supplybit, which Supplybit would make available to Gumprecht to deploy his mining strategy. DSUMF ¶ 11. Supplybit would subject that computer to a "Testing Period" to determine its "Observed Mining Power," its "Observed Running Cost Rate," and its "Expiration Date"—if Gumprecht disagreed with those calculations, he could choose to rescind the Trade-In Miner transaction. *Id.*

The Trade-In Miner process was not an "extraneous" separate bargain; it was part of the core transaction contemplated by the MSAs, as shown by the fact that the very first definition in the MSA relates to "Active Trade-In Miner." DSUMF ¶ 12. References to Trade-In Miners continue through the final Article 9 of the

MSAs. *Id.* In the two MSAs, the phrase "Trade-In Miner" occurs one hundred sixty-four times. *Id.* This process—with Gumprecht (i) locating and acquiring its own Trade-In Miner, (ii) making its own calculations as to its efficacy, (iii) comparing those results with Supplybit's calculations, and then (iv) deciding whether to go forward or rescind—all depended on Gumprecht's entrepreneurial efforts, not Supplybit's. DSUMF ¶ 11.

**E. The True-Up did not impact Gumprecht's decisional rights.**

The MSA also had a "True Up" provision, meaning "for any given period and any given Cryptocurrency, the greater of (a) zero and (b) the sum over all the days in that period of (i) the Theoretical Earnings for that Cryptocurrency on that day minus (ii) the Mining Proceeds for that Cryptocurrency on that day." DSUMF ¶ 22. In essence, this protected against computer failures; if Supplybit's Miners did not function to provide the computing power promised, Supplybit would "True Up" the difference, in the form of the amount of cryptocurrency the computer failure caused Gumprecht to lose. *Id.* Nothing in the True-Up provisions negated Gumprecht's other contractual rights. ECF No. 61-10.

**F. The parties performed until events intervened.**

Amidst this veritable smorgasbord of decisions and options available to Gumprecht, it appears he voluntarily chose the most passive option available: simply mining one cryptocurrency, Bitcoin, without pause, and without engaging in the Trade-In Miner process. That was Gumprecht's choice alone; Supplybit never once disregarded a deployment decision from Gumprecht. DSUMF ¶ 18. It never turned away a Trade-In Miner he attempted to provide; never refused to direct his mining power toward a cryptocurrency he wanted it

directed toward; and never refused a request to pause his mining activity. *Id.* Gumprecht never claims otherwise. *See generally* ECF Nos. 60 & 61.

Gumprecht admits that Supplybit performed as bargained-for for years, from December 30, 2021, through March 2023. DSUMF ¶ 23. Despite his legal training, Mr. Gumprecht said nothing indicating any belief that the MSAs were a security. DSUMF ¶ 24. During this time, Supplybit never operated along the lines of the abstracted hypothetical Gumprecht theorizes in his briefing. DSUMF ¶ 27. Supplybit never sat back while refusing to engage in any of the mining instructions sent by a Client, while solely relying on the "True-Up" provisions to distribute proceeds to the Client. *Id.* Instead, Supplybit always operated as the MSAs indicated; Supplybit deployed the mining decisions and instructions sent by Clients, and used True-Up payments solely in the context contemplated by the MSAs, namely, when a computer or technical failure resulted in a Client receiving less than the full amount of mining power it leased. *Id.*

In March 2023, Silicon Valley Bank—upon which Supplybit relied for its operational financing—collapsed. DSUMF ¶ 26. Supplybit declared a "force majeure" event, defined in the MSAs as any "cause beyond Supplybit's reasonable control … that prevents or significantly impedes Supplybit's performance of its obligations under this Agreement." *Id.*

Even as of June 2023, Gumprecht did not believe the MSAs were securities. DSUMF ¶ 25. A licensed attorney, he believed the dispute sounded solely in contract law. *See* ECF No. 61-9 ("I respectfully request that you avoid breaching the terms of my contracts"). Three months later, he hired a law firm willing to say the MSAs were securities. DSUMF ¶ 25. That volte-face coincided with

Gumprecht wanting to file a lawsuit against Michael Groff and Wesley Decatur in their individual capacities. DSUMF ¶ 24.

Following the collapse of Supplybit, the entity was sued many times by many clients. DSUMF ¶ 28. Supplybit also has been thrown into additional arbitration proceedings. *Id.* Defendants know of not a single other former customer or client of Supplybit who has ever contended that the Mining Services Agreements were an investment contract or a security. *Id.*

The value of Bitcoin Gumprecht received, calculated from the dates he received it, was $1,018,889.48 as of May 2023. DSUMF ¶ 29. Assuming it only started growing then, those Bitcoin are now worth at a minimum $4,323,944.65—far more than the $4,075,000 Gumprecht paid to Supplybit. *Id.* When taking into account the fact that those Bitcoin did not start growing as of May 2023, but rather started growing in January 2022, the Bitcoin Gumprecht mined through Supplybit is worth more than $5,000,000 today, and at least $1 million more than he paid to Supplybit. *Id.*

Gumprecht now seeks to keep the millions of dollars he made through Supplybit; obtain another $4.2 million in windfall cash from Groff and Decatur in their individual capacities (plus whatever his counsel asks for); *and* to keep all the Bitcoin he mined, which will likely continue to go up in value.

**Argument**

Courts decide Rule 12 motions based on what is plausibly, hypothetically true. ECF No. 66. Courts decide summary judgment motions based on what is actually true. Gumprecht's complaint theorized a hypothetical business model where Supplybit ignored every provision of the MSAs, refused to attempt to

carry out a single mining instruction given by a Client, and instead ran its business solely by doling out "True-Up" amounts in a single cryptocurrency, Bitcoin. The problem for Gumprecht at the summary judgment stage is that no facts support his theoretical model for how Supplybit could have been run. Courts elevate form over substance when deciding whether an arrangement constitutes an investment contract—Gumprecht's hypothesized version is the "form," while Supplybit's actual operations are the "substance."

Supplybit carried out the MSAs as drafted—not as Gumprecht theorizes they could have been artfully evaded. Under Supplybit's actual practices, Clients including Gumprecht made deployment decisions and Supplybit executed them. Those individual decisions resulted in individualized proceeds, sent to individualized Client Wallets. Supplybit's model succeeded, until an unexpected bank collapse coincided with a hosting facility failing. The fallout should be adjudicated as a breach of contract question. Gumprecht cannot use an unfounded hypothetical, relying on severe mischaracterizations of the MSAs, to retroactively turn a lease of computer power into a security.

**1. The MSAs are not investment contracts, so they are not securities.**

Gumprecht's claims fail if the MSAs are not securities. Section 2.1 of the Illinois Securities Law (the "Statute") contains an extensive list of items that qualify as a "security," 815 ILCS 5/2.1, but Gumprecht alleges that the MSAs fall into only one of those categories—"investment contracts." Illinois courts follow the same investment contract test as federal courts. *Ronnett v. Am. Breeding Herds, Inc.*, 464 N.E.2d 1201, 1203-04 (Ill. Ct. App. 1984). Under this "*Howey* test," an investment contract means "a contract, transaction, or scheme whereby a person

(1) invests money (2) in a common enterprise (3) with profits to come solely from the efforts of others." *Integrated Rsch. Servs. v. Ill. Sec'y of State*, 765 N.E.2d 130, 135 (Ill. Ct. App. 2002) (citing *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946)). Courts interpreting the Statute deem federal authorities persuasive on this question. *See, e.g.*, *Goldberg v. 401 N. Wabash Venture LLC*, 755 F.3d 456, 465 (7th Cir. 2014). Failure to meet even one of the elements means an arrangement is not a security.

The MSAs are not "investment contracts" under either element two or three. Gumprecht did not invest money "in a common enterprise," with "profits to come solely from the efforts of others." *Integrated Rsch.*, 765 N.E.2d at 135.

**2. The substance of Supplybit's operations trumps the hypothetical form of business Gumprecht theorizes.**

Gumprecht's motion has an overarching failure. He has described a purely hypothetical way he theorizes Supplybit *could* have operated. The parties agree, however, the Court's investment contract analysis should disregard form for substance, emphasizing economic reality. ECF No. 60 at 22; *Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967). Gumprecht violates this stricture at every turn—reason enough to deny him summary judgment, and grant it to Defendants.

Gumprecht has theorized a version of Supplybit where Supplybit never attempts to comply with a single provision of the MSAs, never helps a Client conduct any mining, distributes True-Up sums in the form of Bitcoins it just finds, and somehow gets away with this scheme. *See generally* ECF No. 60. A clever theory slain by undisputed facts, namely, that Supplybit never operated in any fashion resembling that theory. DSUMF ¶ 27. To the contrary, Supplybit operated in the straightforward fashion described in the MSAs—Clients sent deployment instructions, Supplybit executed those instructions, Clients received

their individualized proceeds, and True-Up sums were paid only when some technical failure resulted in a Client receiving less than the full amount of mining power it leased. *Id.* Tellingly, Gumprecht's brief is full of references to what "Supplybit *could*" do, or what "Supplybit *might* do." *See, e.g., id.* at 22 ("Supplybit could choose to mine, or it could choose not to"). The parties are now past the stage of alleging what *could have* or *might have* happened. The summary judgment stage resolves what *did* happen. As a matter of law, this Court must analyze the investment contract question based on what Supplybit did, not what it supposedly could have done (but didn't).

**2.1. Gumprecht repeatedly mischaracterizes the MSAs.**

To support his theory of what Supplybit could have done (an irrelevant topic at the summary judgment stage for the reasons above), Gumprecht repeatedly seeks to rewrite the MSAs. That approach fails, because Illinois courts " will not rewrite a contract … but will enforce the terms as written." *Klemp v. Hergott Grp., Inc.*, 641 N.E.2d 957, 962 (Ill. Ct. App. 1994).

To start with something as simple as word choice—Gumprecht declares it undisputed that Supplybit came to agreements with "investors" to make "investments" in Supplybit. These words appear *forty* times in his fact statement. DSUMF ¶ 5. No doubt, if Supplybit issued contracts deeming the counterparty "investors" making "investments" in Supplybit, the "investment contract" question would lean heavily in Gumprecht's favor. But what Gumprecht declares to be an undisputed fact is in reality an absolute falsehood. Gumprecht agreed that he was a "Client," and "for all purposes" an "independent contractor." DSUMF ¶¶ 2, 5; *see also* CSMF ¶ 19 (noting that Decatur did *not*

testify that "Supplybit had over 200 investors and entered into 400 contracts with investors" as Gumprecht falsely asserts; Decatur testified that Supplybit had 200 clients with 400 contracts).

To be clear, Defendants are not arguing that the lack of the word "investor" or "investment" in the MSAs by itself is dispositive; just that Gumprecht's attempt to obtain summary judgment by mischaracterizing contractual language should not be well taken. *See Sun Commodities, Inc. v. Island Fresh de Puerto Rico, Inc.*, 2024 WL 2300677, at *9 n.1 (D.P.R. May 21, 2024) ("The Court cautions Parties to verify that their statements of fact are supported by their attached evidentiary filings").

Beyond word choice, Gumprecht misrepresents the substance of the MSAs. He purports that "[a]n investor's [he means Client's] sole obligation under the MSA was to pay money to Supplybit. The MSA imposed no further obligations on investors other than providing consideration." ECF No. 61 ¶ 25. That is a brazen falsehood; Defendants have cited over a dozen other obligations in the MSAs. DSUMF ¶ 25. These are easy to find; they all begin with "Client shall."

Worse, Gumprecht purports that "The MSA explicitly limited Supplybit investors' rights 'to its receipt of Mining Proceeds and True-Up Amounts.'" ECF No. 61 ¶ 30. This is another brazen falsehood. DSUMF ¶ 30. One useful metric to determine whether Clients had contractual rights is to search for the words "Supplybit shall" or "Supplybit will" (Supplybit's obligations are the Client's rights); these phrases occur over forty times in each MSA. *Id.*

Gumprecht has plucked a single sentence in § 3.02(b) of the MSA out of context. That provision says a Client cannot sue for "specific performance" on

the topic of which particular computer conducted the Clients' mining activities. ECF No. 61-10 § 3.02(b). But no Illinois court would ever accept the notion that this single, minor limitation on remedies somehow obliterates every other clause and Client-right expressly delineated in the MSA. *Thompson v. Gordon*, 948 N.E.2d 39, 47 (Ill. 2011) (courts construe contract "as a whole, viewing each provision in light of the other provisions," rather than "viewing a clause or provision in isolation, or in looking at detached portions of the contract").

Indeed, this clause does not even grant Supplybit full or total discretion over Miner-related decisions (to be distinguished from Mining-related decisions, which belonged *solely* to Clients). Supplybit retained only "reasonable discretion in deciding which kinds of Miners to operate, and where, when, and how to operate them, in advance of the Purpose." ECF No. 61-10 § 3.02(b). Under Illinois law, a party with a contractual right to exercise discretion must still do so reasonably, with proper motive, and not arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of the parties. *Mid-W. Energy Consultants, Inc. v. Covenant Home, Inc.*, 815 N.E.2d 911, 916 (Ill. Ct. App. 2004). Under Illinois law, Supplybit could never cite this single subsection to then attempt to sidestep every other obligation in the MSAs other than paying True-Up sums, or to claim the "MSA did not require Supplybit to mine at all," *contra* ECF No. 60 at 20—but of course, no Illinois court ever decided that question, because this scenario is a hypothetical fantasy, not reality. DSUMF ¶ 27. *See also Peterson*, 2024 WL 4476454, at *1 (courts ignore this type of "unsupported speculation" for summary judgment purposes).

Mischaracterizations aside, Gumprecht also ignores material language that

refutes his claims. He agreed that the text of the MSAs were the parties' sole agreement, DSUMF ¶ 4, which renders most of his designated evidence irrelevant. Also, the *Howey* test asks whether Gumprecht's *purpose* in entering the MSAs was to sit passively while investing in Supplybit's mining activities; but he explicitly declared the opposite Purpose in the MSAs, that *he* wanted to mine cryptocurrency for himself. DSUMF ¶ 7. The notion that he had no significant role to play in the failure or success of his fortunes, *see* ECF No. 60 at 19, is also impossible to square with him agreeing "for all purposes"—including for determining whether the MSA is a security—he was an "independent contractor." DSUMF ¶ 2. Although most often cited in the context of determining whether one person's torts can be attributed to another, Gumprecht's description of his role is telling—the hallmark of an independent contractor is that he retains substantial control over his own acts. *Carney v. Union Pac. R. Co.*, 77 N.E.3d 1, 7 (Ill. 2016); *see also* INDEPENDENT CONTRACTOR, Black's Law Dictionary (12th ed. 2024) ("[s]omeone who is entrusted to undertake a specific project but who is left free to do the assigned work and to choose the method for accomplishing it"). That phrasing is consistent with Gumprecht's self-declared "Purpose," as well as the myriad discretionary choices he was to exercise under the MSAs. DSUMF ¶¶ 9–12. Gumprecht's agreed-upon label of "independent contractor" is utterly inconsistent with Gumprecht's new position that he lacked any control, or that he was solely <u>de</u>pendent on a common enterprise.

On all of these topics, Illinois law holds Gumprecht to his word, *Thompson*, 948 N.E.2d at 47, even if he'd rather pretend these words didn't exist.

Undisputed facts show that the MSAs were not a ruse; Supplybit operated in

accordance with the MSAs, paying heed to the discretionary deployment choices made by Clients. At the summary judgment stage, what matters is the economic reality of Supplybit's operations; not Gumprecht's unfounded fantasy of what Supplybit could have done to evade the MSAs' obligations.

### 2.2. The Trade-In Miner provisions alone entitle Defendants to summary judgment; the Court should reject Gumprecht's mischaracterization of the evidence.

If Gumprecht's success "depended very much on him, on his technical knowledge and … expertise," then the MSAs are not investment contracts. *Sanchez-Cardona v. Corp. Planners, Inc.*, 895 F. Supp. 26, 30 (D.P.R. 1995). Gumprecht cannot deny that the Trade-In Miner provisions fit this description precisely; the Trade-In Miner provisions depended *solely* on Gumprecht, his knowledge, his expertise, and his efforts. Gumprecht knows this aspect of the MSAs pose a problem for his investment contract theory, so he offered two counterarguments. ECF No. 60 at 22–23. Both fail as a matter of law.

Gumprecht's first argument is to deem the Trade-In Miner provisions "extraneous," "incidental," and "unrelated" to the MSAs. ECF No. 60 at 22. Gumprecht's argument violates Illinois's law, which mandates that this Court view the MSA "as a whole, viewing each provision in light of the other provisions." *Thompson*, 948 N.E.2d at 47; *see also Howey*, 328 U.S. at 295 (refusing to analyze land sale contract or warranty deed on a piece-by-piece basis). Legal impossibility aside, the argument makes no sense. The Trade-In Miner concept spans the entire MSA, from the first definition to the last article. DSUMF ¶ 12. It goes directly to increasing Gumprecht's mining power, which in turn goes directly to Gumprecht's self-declared "Purpose" of engaging in cryptocurrency

mining. DSUMF ¶ 7. Gumprecht's claim that the Trade-In Miner process in the MSA was unrelated to the MSA—even as it is interwoven throughout the entire MSA, and relates directly to Gumprecht's self-declared Purpose in entering the MSA—is precisely the type of "conclusory allegation[], improbable inference[], and unsupported speculation" this Court must disregard. *Peterson*, 2024 WL 4476454, at *1.[4]

Gumprecht's second argument once again mischaracterizes evidence. Gumprecht purports that "in September 2022, Supplybit informed investors [he means clients] that it was no longer accepting trade-in miners." ECF No. 61 ¶ 56. That is not true. Gumprecht has cited a single email correspondence, with a single individual, who was attempting to structure a particular trade-in miner transaction that would comport with Italian tax laws. CSMF ¶ 56. Supplybit told that one client that Supplybit is not accepting trade-in miners, not every client. *Id.* Further, as Gumprecht knows, Decatur testified that such a policy of ending all trade-in miner transactions could only be made by Groff, and Groff denied giving such a request. *Id.*

Gumprecht fails to explain how this email to one Italian—which he never claims to have seen before discovery—would impact his MSAs. On this topic, the undisputed evidence is that Supplybit *never* refused a Trade-In Miner transaction from Gumprecht. DSUMF ¶ 18. Perhaps Gumprecht means to guess that *if* he had attempted a Trade-In Miner transaction Supplybit would have refused it; but

[4] To the extent this Court will entertain the possibility that an MSA term running throughout the entire MSA is actually extraneous to the same MSA, at a minimum, the concepts of "unrelated," "extraneous," and "incidental" all involve weighing subjective considerations, which alone means Gumprecht's motion must be denied. *Rodriguez Velazquez v. Autoridad Metropolitana de Autobuses*, 502 F. Supp. 2d 200, 204 (D.P.R. 2007).

this is yet more "unsupported speculation" the Court must disregard. *Peterson*, 2024 WL 4476454, at *1.

The Trade-In Miner provisions alone show that Gumprecht had a meaningful say in his economic outcome, refuting the "profits to come solely from the efforts of others" prong. *Integrated Rsch.*, 765 N.E.2d at 135. Gumprecht only has two counterarguments but both fail as a matter of law. On this topic alone, the Court should grant summary judgment in full to Defendants.

**2.3. Gumprecht misrepresents the Luxor "pooling."**

To meet the commonality prong, Gumprecht claims that Supplybit pooled investor [he means client] funds and compensated clients according to pro-rata shares. ECF No. 60 at 14–17. This again mischaracterizes the evidence.

First, the third-party entity Luxor conducted the mining pools. Gumprecht offers no argument for why Luxor operating a pool would impact the relationship between Gumprecht and Supplybit, which the MSA governs.

Second, the SEC has recently issued authoritative guidance clarifying that mining pools are not investment contracts or securities regardless. SEC Statement on Certain Proof-of-Work Mining Activities (available at https://www.sec.gov/newsroom/speeches-statements/statement-certain-proof-work-mining-activities-032025) ("when a miner combines its computational resources with other miners to increase their chances of successfully mining new blocks on the network, the miner has no expectation of profit derived from the entrepreneurial or managerial efforts of others. By adding its own computational resources to a mining pool, the miner merely is engaging in an administrative or ministerial activity to secure the network, validate transactions and add new

blocks, and receive Rewards").

Third, Gumprecht has taken snippets of testimony and exhibits out of context, to falsely suggest that the only metric for how much money a Client made was the amount of power purchased. But that suggestion is built on a false premise; it assumes that clients were locked into a single mining option, when they weren't. The undisputed evidence is that Supplybit did not pool Clients' individual proceeds. DSUMF ¶ 16. If two Clients made different individualized deployment decisions (one paused while the other mined, or one mined Bitcoin while another mined a different cryptocurrency), each Client would receive the proceeds from his own decisions. *Id.* Supplybit did not pool Clients' results, nor did Supplybit provide averaged or pro-rata returns to Clients. *Id.*

**3. Undisputed evidence refutes the theory that the MSAs were shams, so Defendants incorporate their prior briefing.**

Defendants have already briefed at length how the language of the MSAs foreclose Gumprecht's "investment contract" theory. ECF Nos. 34 & 42. For purposes of Rule 12, Gumprecht responded by relying on his allegations and case law where parties alleged that they had been tricked into agreements where the promise of individualized destiny was "a sham." ECF No. 39 at 5 (citing *Dettmering v. VBit Techs. Corp.,* 2023 WL 4824955, at *2 (D. Del. July 27, 2023)). Gumprecht cited his pleading's theory that Supplybit didn't even engage in cryptocurrency mining, and gave its clients no option to make the decisions described in the MSA. *Id.* at 7. Gumprecht pled that "Supplybit … was, in fact, not selling mining services at all." *Id.* He said for Rule 12 purposes, there was no evidence "that Supplybit in fact paid Gumprecht with *mining* proceeds; all [that Gumprecht alleged] is that, for some time, Supplybit paid Bitcoin, from whatever

source, to Gumprecht." *Id.* at 9.

The summary judgment stage is the put up or shut up moment in litigation. *Garmon v. Nat'l R.R. Passenger Corp.*, 844 F.3d 307, 316 (1st Cir. 2016). Gumprecht has no evidence substantiating his theory that Supplybit never engaged in mining at all, and just found Bitcoin "from whatever sources" to send to Gumprecht as a "True-Up." DSUMF ¶ 27. The undisputed evidence is the opposite—that Supplybit followed the MSAs under their common sense reading where Clients make deployment decisions, and then Supplybit executed those decisions, sent back individualized proceeds stemming from those individual decisions, and used the True-Up solely to make up for temporary failures to provide mining power. *Id.* Gumprecht's strategy on summary judgment has been to adopt an unreasonable reading of the MSA that no Illinois court would countenance, or to mischaracterize evidence (like claiming one email to one Italian client was actually an announcement to every client). *See* § 2 above. With those arguments out of the way, everything Defendants originally argued at the Rule 12 stage has full force, now backed by undisputed evidence.

Accordingly, Defendants incorporate all of those arguments here. As Defendants briefed, the MSAs did not establish a common enterprise. *Compare* ECF No. 34 at 10–16 *with* DSUMF ¶¶ 15–17. Gumprecht did not expect to make money solely from the efforts of others. *Compare* ECF No. 34 at 16–18 *with* DSUMF ¶¶ 7, 10, 11, 27. Gumprecht's theory that Supplybit engaged in no mining at all and simply found Bitcoin to distribute as True-Ups is now debunked. *Compare* ECF No. 34 at 18–20 *with* DSUMF ¶ 27. And the Trade-In Miners were, in fact, *not* "unrelated," they are an integral piece of the MSA.

*Compare* ECF No. 34 at 20–21 *with* DSUMF ¶ 12.

The evidence is in—it supports Defendants' positions, and refutes Gumprecht's speculation. Defendants request summary judgment.

**4. Gumprecht's voluntary choice to remain passive is irrelevant.**

Gumprecht has another argument—that his voluntary choice to remain passive turned the MSAs into a security. *See* ECF No. 60 at 18 ("Gumprecht did not need to lift a finger"); at 26 ("Gumprecht did not need to make any decision at all"). Defendants have already briefed why this argument fails, as a matter of law, and Gumprecht has yet to provide a response.

Courts have unanimously concluded that the *Howey* factors—for instance, a plaintiff's level of control—are assessed at the time of the investment, not at some point later in time. *Keith v. Black Diamond Advisors, Inc.*, 48 F. Supp. 2d 326, 334 (S.D.N.Y. 1999) ("[I]f at the time of the investment … Keith did not intend to be a passive investor … [his] interests could not be securities" (emphasis added)); *SEC v. Merchant Capital, LLC*, 483 F.3d 747, 756 (11th Cir. 2007) ("We analyze the expectations of control at the time the interest is sold, rather than at some point later in time after the expectations of control have developed or evolved"); *Foxfield Villa Associates, LLC v. Robben*, 967 F.3d 1082, 1093 (10th Cir. 2020) (same). Even if Gumprecht decided to do nothing more than sit passively waiting for Bitcoin returns, that would not transform the MSAs into securities. "The mere choice by a partner to remain passive is not sufficient to create a security interest." *Keith*, 48 F. Supp. 2d at 333; *Merchant Capital*, 483 F.3d at 756 ("A post-sale delegation [of control] cannot … convert a general partnership into an investment contract, if the partners had control at the beginning").

The evidence of Gumprecht's initial purpose is undisputed. Gumprecht's "Purpose" was *his*—not Supplybit's—efforts to mine cryptocurrency, for his own benefit. DSUMF ¶ 7. He purchased "Mining Access Rights," the right to deploy Mining Power "toward the mining of one or more Cryptocurrencies" of *his* choice. DSUMF ¶ 8. He expected to be treated "for all purposes" as an "independent contractor[]," DSUMF ¶ 2, a phrase that counselor Gumprecht understands to mean that he maintained control over his financial fate.

Gumprecht has cited a line from *Integrated Rsch.* 765 N.E.2d at 136, but has inverted its meaning. ECF No. 60 at 21. Gumprecht says the law is clear that the ability to place a "hold" on the use of investment proceeds does not refute a finding of a security (presumably Gumprecht means to reference his undisputed right to pause mining whenever market conditions dictated). But the quoted material actually refused to credit testimony that those investors had such a "pause" right, where the text of their agreement did not support that testimony. *Integrated Rsch.*, 765 N.E.2d at 136. This Illinois authority supports Defendants' position, not Gumprecht's—his view that he had no decision-making authority over his financial fate is "inconsistent with the broad authority given to" him in the MSAs. *Id.*

No facts support the theory that the options available to him were a ruse—Supplybit never once disregarded a deployment decision from Gumprecht regarding what cryptocurrency to mine, when to pause, or when to accept a Trade-In Miner. DSUMF ¶ 18. The undisputed evidence shows that any passivity was Gumprecht's choice alone; but his "mere choice … to remain passive is not sufficient to create a security interest." *Keith*, 48 F. Supp. 2d at 333.

**5. Even if the MSAs were securities, Decatur is entitled to summary judgment.**

Unlike Groff, Decatur did not own equity in Supplybit. ECF No. 61 ¶ 14. Even if the MSAs were securities, Decatur can face individual liability only if he "participated or aided in making the sale." 815 ILCS 5/13(A). In his complaint, Gumprecht pled a single theory for why Decatur would qualify; Gumprecht alleged that Decatur "*directly* aided in making an illegal sale by, among other things, *soliciting Gumprecht's purchase*." ECF No. 1 ¶ 56 (emphasis added).

Notably, Gumprecht did not attempt to support that allegation with a single fact. His statement of facts says nothing about Decatur soliciting him, directly or indirectly. ECF No. 61. His declaration is even more explicit; he spoke only with Groff, not Decatur. ECF No. 61–13 ¶ 4. Gumprecht failed to support his allegations for individual liability against Decatur with facts. Having failed to establish this necessary element, Decatur is entitled to summary judgment, regardless of whether the MSAs are securities. *Celotex*, 477 U.S. at 317.

Abandoning the theory he pled, Gumprecht has switched to a new theory in his briefing; that Decatur was generally involved in designing the MSAs. This is a non-starter. Courts reject the introduction of new theories at summary judgment as "impermissible attempt[s] to constructively amend the complaint." *Harris v. Reston Hosp. Ctr., LLC*, 523 F. App'x 938, 946 (4th Cir. 2013). "Because a complaint guides the parties' discovery, putting the defendant on notice of the evidence it needs to adduce in order to defend against the plaintiff's allegations, constructive amendment of the complaint at summary judgment undermines the complaint's purpose and can thus unfairly prejudice the defendant." *Id.* (collecting cases). The First Circuit follows these precepts. *Asociacion de*

*Suscripcion Conjunta del Seguro de Responsabilidad Obligatorio v. Juarbe-Jimenez*, 659 F.3d 42, 53 (1st Cir. 2011); *Portfolioscope, Inc. v. I-Flex Sols. Ltd.*, 473 F. Supp. 2d 252, 256 (D. Mass. 2007).

Even if Gumprecht were allowed to amend his complaint through his summary judgment motion, his argument would fail. He says Decatur can be liable upon "some showing of assent, approval or concurrence, albeit tacit approval, in the action of the group in selling securities." ECF No. 60 at 23 (citing *Froehlich v. Matz,* 417 N.E.2d 183, 190 (Ill. App. Ct. 1981)). But *Froehlich* was describing the circumstances under which *a controlling person* can be held liable. 417 N.E.2d at 190 ("While overt action *by a member of a controlling group* would not always be required, there must be some showing of assent …" ). Gumprecht alleged that only *Groff* was a "controlling person," but that Decatur was instead "a director and officer"—binding judicial admissions that Gumprecht cannot change now. ECF No. 1 ¶¶ 54, 56.

The test for directors and officers is different than for controlling persons; whether Decatur directly solicited, encouraged, or induced the sale. *Sears v. Kaufmann*, 1995 WL 513499, at *3 (N.D. Ill. Aug. 25, 1995), as modified (June 26, 1996). Recognizing that the Statute "is a far more restrictively structured statute than the 1933 and 1934 Acts," Illinois courts have warned against "unreasonably and inequitably expand[ing] the liability established under the Securities Act into areas never intended." *Carlson v. Bear, Stearns & Co. Inc.*, 906 F.2d 315, 318 (7th Cir. 1990) (cleaned up). Aside from the impermissible attempt to amend his pleading, Gumprecht did not attempt to meet this standard.

Even if the MSAs were securities, Decatur is entitled to summary judgment.

**6. Gumprecht's request for rescission is untimely as a matter of law.**

Gumprecht seeks rescission. ECF No. 60 at 7. Illinois's Statute has a strict timeframe in which a purchaser must send a seller notice that it will seek rescission: "within 6 months after the purchaser shall have knowledge that the sale of the securities to him or her is voidable." 815 ILCS 5/13(B).

The MSAs were executed on December 30, 2021, and December 30, 2022. DSUMF ¶ 1. Gumprecht makes no allegation of any factual discovery that later caused him to believe the MSAs were voidable.[5] For example, he does not claim that someone told him the MSAs had been registered, but that he subsequently discovered that they were not. His only theory for why his case is timely is that a lawyer told him the MSAs were a security in September 2023. ECF No. 1 ¶ 35. In other words, Gumprecht discovered no new *facts* relating to his December 2021 or December 2022 transactions; he claims only that he learned new law in September 2023. This argument fails.

"When a right to sue is based upon a statute … Illinois courts have charged a party with constructive knowledge" of the relevant law, *Wells Fargo, N.A. v. Nguyen*, 2024 IL App (3d) 230253 ¶ 33, because "[i]t is a common maxim that ignorance of the law is no excuse." *Clark v. Lay*, 2022 IL App (4th) 220101, ¶ 45; *People v. Hollins*, 2012 IL 112754, ¶ 34. Accordingly, what matters is not "what [Gumprecht] actually knew but also what they could have known 'by the use of the means of information within [his] reach with the vigilance the law requires of [him].'" *Nguyen*, 2024 IL App (3d) 230253 ¶ 33 (quoting *Pyle v. Ferrel*, 12 Ill. 2d 547, 554 (1958)). Notably, this is the standard governing lay people. *Summers v.*

---

[5] To be clear, Defendants deny the MSAs are securities. Even if they were, however, Gumprecht's claims are barred.

*Nyre*, 2025 IL App (1st) 241447-U, ¶ 50 (courts "feel very little sympathy" for tenants did not timely invoke tenant-protection laws, but because they were charged with knowledge of those laws). Gumprecht is not a layperson; he is a licensed attorney. DSUMF ¶ 3. Gumprecht knew every fact he needed to know to make his securities argument as soon as he entered into the MSAs (and the law charges him with knowledge of Illinois's securities Statute).

Illinois has recognized one exception to this rule in the securities context, *Frendreis v. Fin. Concepts, Ltd.*, 435 N.E.2d 1304, 1307 (Ill. Ct. App. 1982), which said that the six-month period did not begin to run as to those plaintiffs (laymen, not attorneys) because the plaintiffs were waiting for the results of proceedings brought by the Secretary of State. Illinois courts have subsequently explained the limitation to that rule: "The *Frendreis* rule should not be extended beyond the situation in which administrative proceedings to determine the legality of the transactions are pending and the purchasers did not otherwise learn of the voidability of the transactions before those proceedings began." *Buehl v. Dayson*, 469 N.E.2d 403, 409 (Ill. Ct. App. 1984). Federal courts sitting in Illinois agree with *Buehl*. *Lincoln Nat. Life Ins. Co. v. Silver*, 1987 WL 5415, at *3 (N.D. Ill. Jan. 15, 1987) (I conclude that the Illinois Supreme Court … would follow the approach used by the Court in Buehl v. Dayson"); *Ansbro v. Se. Energy Grp., Ltd.*, 658 F. Supp. 566, 572 (N.D. Ill. 1987) ("While the statute requires knowledge of the voidability of the sale, it does not, contrary to Ansbro's argument, require actual knowledge that the sale is voidable").

Illinois law charges Gumprecht—a licensed attorney—with constructive knowledge of the law. He learned no new *facts* about his MSAs that changed his

mind about whether they were voidable. As such, the time to send a notice of rescission was June 30, 2022, and June 30, 2023, for the first and second MSAs respectively. He concedes he missed those deadlines. ECF No. ¶ 1 ¶ 35 (admitting Gumprecht's June 2023 letter "did not demand rescission under the Illinois Securities Act"). His request for rescission is untimely, another reason to award summary judgment to the Defendants.

**7. Gumprecht suffered no damage. His request for a windfall worth millions should be rejected.**

The rescission option in 815 ILCS 5/13 is rooted in equity. If someone is aggrieved under the Securities Act, they can rescind the transaction, and get back what they paid *minus* the gain they are keeping.

Gumprecht's ledgers are deceptive in the extreme. ECF Nos. 61-14, 15. The amounts listed reflect "the amount of Bitcoin received in each deposition [and] the value of 1 Bitcoin *at the precise time Supplybit made each deposit*." ECF No. 61 ¶ 61 (emphasis added). Tallying those up, Gumprecht says he paid a total of $4,075,000, and he would have this Court believe he only got back $1,018,889.48 in value. ECF No. 61 ¶ 64.

Even according to Gumprecht, however, this ~$1M figure was the value of these Bitcoin of May 2023. DSUMF ¶ 29. In May 2023, the price of one Bitcoin was roughly $27,500. *Id.* When Groff last checked today, August 22, 2025, the price of one Bitcoin is approximately $116,704. *Id.* So the value today of the Bitcoin Gumprecht produced through Supplybit is at a minimum $4,323,944.65. *Id.* That alone is more than the $4,075,000 he paid to Supplybit. *Id.*

Even the $4,323,944.65 figure massively undercounts Gumprecht's gains, as it assumes his Bitcoins started growing only in May 2023. DSUMF ¶ 30. But some

of Gumprecht's mining proceeds began to grow as early as January 1, 2022. *Id.* Considering that added growth, the value of the Bitcoin Gumprecht mined through Supplybit is easily worth more than $5,000,000 today—and at least $1 million more than he ever paid to Supplybit. *Id.*

The undisputed facts show that Gumprecht is already over $1 million ahead from his relationship with Supplybit. He wants to keep that money; but also get another $4.2 million from Groff and Decatur in their individual capacities (not even counting the attorney fees his counsel will seek to add to that); *and* he wants to keep the Bitcoin produced through his mining with Supplybit, which will likely continue to increase in value.

Gumprecht identifies no Illinois authority that enables him to ask for windfall damages in this way. The fact that he came out ahead by over $1 million shows that he has suffered no injury, and his claim is therefore barred. *See Goldfine v. Barack, Ferrazzano, Kirschbaum & Perlman*, 2014 IL 116362, ¶ 33, 18 N.E.3d 884, 894 (holding that 815 ILCS 5/13(A) is a remedial, not punitive statute, and "remedial damages [are] intended to compensate plaintiffs who prove actual damages resulting from a violation of the Illinois Securities Law").[6]

**Conclusion**

Summary judgment should be entered in Groff's and Decatur's favor.

6 At a minimum, in the alternative, there is a material dispute whether the $1,018,889.48 figure Gumprecht cites is the "amount received by the purchaser on the securities." 815 ILCS 8/15(A)(1).

**Certificate of Service**

WE CERTIFY that today we electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send electronic notification of such filing to Plaintiff and all counsel of record.

Dated: August 22, 2025

Respectfully submitted

*/s/ Tomás A. Román-Santos*
Tomás A. Román-Santos, Esq.
USDC-PR 219806
Román Santos LLC
Miramar Plaza, Ste. 702
954 Ponce De Leon Ave.
San Juan, PR 00908
(787) 300-2811
(787) 300-2814 (fax)
tomas@roman-santos.com

*/s/ Peter S. French*
Peter S. French, pro hac vice
Paul Coogan, pro hac vice
Vivek R. Hadley, pro hac vice
Taft Stettinius & Hollister LLP
One Indiana Square, Ste. 3500
Indianapolis, IN 46204
(317) 713-3500
(317) 713-3699 (fax)
pfrench@taftlaw.com
pcoogan@taftlaw.com
vhadley@taftlaw.com

*Attorneys for Defendants Michael Groff and Wesley Decatur*