IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

MICHAEL E. GUMPRECHT, LLC,

    **Plaintiff,**

          v.

MICHAEL GROFF and WESLEY DECATUR,

    **Defendants.**

CIVIL NO. 24-1210  (JAG)

## OPINION AND ORDER

GARCIA-GREGORY, D.J.

Pending before the Court is Plaintiff Michael E. Gumprecht, LLC's ("Plaintiff")[1] Motion for Summary Judgment. Docket No. 60. Plaintiff argues that Defendants Michael Groff and Wesley Decatur ("Defendants") sold unregistered security contracts, the Mining Services Agreements ("MSAs"), in violation of the Illinois Securities Law Act of 1953 (the "Act"), 815 ILL. COMP. STAT. ANN 5/1 *et seq.* (West 2016). Docket No. 1 at 15-16. It also contends that Defendants are subject to control person and director liability under the statute and seeks class certification. *Id.* at 14-15. Plaintiff asserts jurisdiction under both the diversity statute and the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), as "it is a putative class action in which more than $5,000,000 is in controversy." *Id.* at 2; *see Cooper v. Charter Commc'ns. Ents. I, LLC*, 760 F.3d 103, 106 (1st Cir. 2014) (CAFA "grants jurisdiction to federal courts to hear state-law class actions if there

---

[1] Plaintiff is a limited-liability company incorporated and headquartered in the State of Georgia. Docket No. 61-13 at 1. The Court shall refer to Michael E. Gumprecht, LLC as "Plaintiff" and shall refer to the individual Michael E. Gumprecht as "Gumprecht."

CIVIL NO. 24-1210(JAG)

is minimal diversity of citizenship between the parties, as the parties agree there is here, and the amount in controversy exceeds five million dollars.") (quoting 28 U.S.C. § 1332(d)(2)).[2]

Also before the Court is Defendants' Cross-Motion for Summary Judgment. Docket No. 67. Defendants claim that Plaintiff wants the Court to rewrite "the terms of the bargain." *Id.* at 6. Per Defendants, the MSAs do not qualify as securities because Plaintiff had a wide latitude of control under the agreements. *Id.* at 6, 9-10. "These individual decisions inured to [Plaintiff's] sole benefit. His Client Wallet went up or down based on his decisions, independently of any other Client's performance or Supplybit's overall performance." *Id.* at 6. Alternatively, Defendants argue that Plaintiff's "idiosyncratic reading of the MSAs—where he interprets them to have the opposite purpose and effect than what he declared in writing—presents a question of fact regarding the true, underlying economic reality of the MSAs." *Id.* at 7. Defendant Decatur individually moves to dismiss the claims against him because he did not participate or aid in the sale of the alleged security to Plaintiff. *Id.* at 28-29.

For the below stated reasons, Plaintiff's Motion for Summary Judgment is **GRANTED IN PART** and **DENIED IN PART**, and Defendants' Cross-Motion for Summary Judgment is **GRANTED IN PART** and **DENIED IN PART**.

## FACTUAL BACKGROUND

### I.    Bitcoin Background

Bitcoin, a virtual asset, is created on a "digital ledger" known as a "blockchain." Docket Nos. 61 at 2; 68 at 1; 11 at 5. Blockchain is maintained through a network of computers that employ

---

[2] "Here, although a class has not been certified, the district court [may] treat[] the complaint as asserting a class action." *Cooper*, 760 F.3d at 106. CAFA applies "to any class action before or after the entry of a class certification order by the court with respect to that action." 28 U.S.C. § 1332(d)(8).

CIVIL NO. 24-1210(JAG)

a cryptographic function known as a "hash." Docket Nos. 61 at 2; 68 at 1; 11 at 5. A hash is used as a key, which validates a transaction—known as a "block"—and links this block to all prior transactions as part of a "chain." Docket Nos. 61 at 2; 68 at 1; 11 at 5. On average, the quantity of hash deployed on a network is proportional to the speed in which Bitcoin is awarded or "mined." Docket Nos. 61 at 2; 68 at 1; 11 at 5-6. Under an agreement known as a "mining pool," a group can combine their computing resources and share the successfully mined Bitcoin. Docket Nos. 61 at 2; 68 at 2; 11 at 6. The cost of deploying hash can be impacted by factors such as the cost of electricity and the efficiency of the computing, among others. Docket Nos. 61 at 2; 68 at 2; 11 at 6. Broadly, the cost of Bitcoin has increased since 2010. Docket Nos. 61 at 3; 68 at 2; 11 at 6.

## II.    Supplybit LLC

Supplybit LLC, a since dissolved Delaware limited liability company, was founded by its Chief Executive Officer, Defendant Groff, to mine Bitcoin for himself. Docket Nos. 61 at 3; 61-3 at 108; 61-12 at 4; 68 at 2-3. Defendant Decatur served as Chief Financial Officer and Managing Director. Docket Nos. 61 at 3; 61-3 at 52; 61-12 at 4; 68 at 3. Supplybit had two employees during the relevant period. Docket Nos. 61 at 3; 61-4 at 40; 68 at 2-3.

Mining Bitcoin has inherent operational risks associated with it, which can make mining challenging. Docket Nos. 61-3 at 99-100; 61 at 3; 68 at 3. Supplybit owned thousands of mining computers, valued at $40.2 million in 2022, to support its Bitcoin mining operation. Docket Nos. 61 at 4; 61-3 at 97; 61-5 at 41; 61-6 at 60; 61-7 at 16; 68 at 4. Supplybit would generate hash power through mining equipment it owned. Docket Nos. 61-3 at 11; 61-6 at 149. The company utilized Luxor, a third-party mining pool, to generate additional hash power. Docket No. 61-3 at 44-45. Supplybit's clients signed an MSA. Docket Nos. 61 at 4; 61-3 at 10; 68 at 4. Supplybit did not register the MSA as a security under federal or state law. Docket Nos. 11 at 2; 61 at 5; 61-5 at 70.

CIVIL NO. 24-1210(JAG)

Wire and cash payments made by clients would be placed into Supplybit's bank account. Docket No. 61-5 at 46-47.

## III.    The Mining Services Agreements

The MSAs governed the relationship between Supplybit and its clients. *See* Docket Nos. 61-10, § 9.15 ("This Agreement constitutes the entire agreement between the Parties as to the subject matter described herein and supersedes any prior agreements, understandings, representations, warranties, and restrictions between the Parties that relate to such subject matter."); 61-11, § 9.15 (same). All parties to the MSA were to be treated as independent contractors. Docket Nos. 61-10, § 9.01; 61-11, § 9.01.[3]

Under the MSAs, clients "purchased" or "leased" mining power. Docket Nos. 11 at 1; 61 at 5; 61-5 at 83. Mining power is the amount of hash per second deployed for the mining of a cryptocurrency. Docket Nos. 61-10, §§ 1.29, 1.49; 61-11, §§ 1.29, 1.49. Clients additionally could sell a miner, known as a Trade-In Miner, to Supplybit to increase their current max mining power under the agreement. Docket Nos. 61-10, § 1.54; 60-11, § 1.54. Trade-In Miners were subjected to a testing period in which Supplybit would calculate the miner's observed mining power, observed running cost rate, and expiration date, and inform the client of its determinations. Docket Nos. 61-10, §§ 1.51, 3.08; 61-11, §§ 1.51, 3.08.

Clients' mining power would be automatically directed towards the mining of Bitcoin, unless the client stated otherwise. Docket Nos. 61-10, § 3.01(e); 61-11, § 3.01(e). Notwithstanding, the MSAs provide that

> [A client] shall have no right to specific performance under this Agreement such as might compel Supplybit to operate any particular Miners in any particular fashion or to deploy any particular amount of Mining Power, Client's rights under this

---

[3] "Plaintiff denies that it and Supplybit are, in substance, 'independent contractors.'" Docket No. 70 at 69.

CIVIL NO. 24-1210(JAG)

> Agreement instead being limited to its receipt of Mining Proceeds and True-Up Amounts as set forth herein.

*Id.* at 9. Mining Proceeds and True-Up Amounts represent a definite quantity of cryptocurrency. Docket Nos. 61-3 at 60; 61-6 at 93; 61-10, §§ 1.31, 1.56; 61-11, §§ 1.31, 1.56. Mining Proceeds, as defined in the MSAs, are "the amount of Cryptocurrency actually secured" during a set period in which mining power was deployed. Docket Nos. 61-10, § 1.31; 61-11, § 1.31. True-Up Amounts are "for any given period and any given Cryptocurrency, the greater of (a) zero and (b) the sum over all the days in that period of (i) the Theoretical Earnings for that Cryptocurrency on that day minus (ii) the Mining Proceeds for that Cryptocurrency on that day." Docket Nos. 61-10, § 1.56; 61-11, § 1.56. In other words, "True-Up Amounts refers to the amount of crypto currency that should have been produced, but wasn't produced due to a computer or other technical failure on Supplybit's part." Docket No. 68 at 8. The MSAs provide that "[t]he term 'Cryptocurrency' shall mean Bitcoin." Docket Nos. 61-10, § 1.14; 61-11, § 1.14.

Clients were promised "100% uptime," meaning that if a client's miner went offline, they would be "compensated for the downtime" through True-Up Payments. Docket Nos. 61-3 at 21; Docket Nos. 61-10, §§ 1.56, 3.05; 61-11, §§ 1.56, 3.05. The MSAs additionally provided

> Client acknowledges and agrees that Supplybit may exercise its reasonable discretion in deciding which kinds of Miners to operate, and where, when, and how to operate them, in advancement of the Purpose. Client also acknowledges and agrees that Supplybit, in its sole discretion, may select which particular Miners to utilize when allocating Mining Power to Client in fulfillment of Section 3.01(f), including without limitation giving priority to Trade-In Miners regardless of any associated Incremental Running Cost Rates, provided that Supplybit shall not utilize Trade-In Miners during their Testing Periods for the purpose of satisfying Client's Mining Access Rights. Furthermore, Client acknowledges and agrees that it shall have no right to specific performance under this Agreement such as might compel Supplybit to operate any particular Miners in any particular fashion or to deploy any particular amount of Mining Power, Client's rights under this Agreement instead being limited to its receipt of Mining Proceeds and True-Up Amounts as set forth herein.

CIVIL NO. 24-1210(JAG)

Docket Nos. 61-10, § 3.02(b); 61-11, § 3.02(b). The MSAs also contained force majeure clauses. Docket Nos. 61-10, § 3.07; 61-11, § 3.07. Plaintiff never specified any deployment decision for his investments. Docket No. 70-1 at 1.

 IV.    Plaintiff and Supplybit's Relationship

Plaintiff admits that Supplybit performed as bargained-for for years, from December 30, 2021, through March 2023. Docket No. 1 at 10. Before signing the first MSA, Plaintiff was assured Supplybit's operations were sufficiently diversified to protect against potential risk. Docket No. 61-13 at 2. Defendant Groff assured Plaintiff that Supplybit was partnered with organizations in Canada, Iceland, and other Nordic nations, which would serve as a safeguard in case Supplybit would have to cease its operation in the United States. *Id.*; Docket No. 61-4 at 126-29. Supplybit created marketing materials that featured the words "guaranteed daily revenue." Docket Nos. 61-8; 61-3 at 103-04.

Plaintiff signed the first MSA on December 30, 2021. Docket No. 61-10. After, Plaintiff issued a payment of $2,175,000 to Supplybit. Docket Nos. 61-13 at 2; 63. Defendant Decatur confirmed receipt of the payment through an email dated September 30, 2022. Docket No. 61-5 at 12-13. Earlier that same month, on September 7, 2022, Defendant Decatur had informed one client via email that "[u]nfortunately, [Supplybit is] no longer accepting trade-in miners for the foreseeable future." Docket No. 61-17 at 2. Plaintiff signed a second MSA on December 30, 2022, and made a corresponding payment of $1,900,000. Docket Nos. 61-11; 61-13 at 2; 64.

On March 16, 2023, Supplybit sent an email to Plaintiff invoking the force majeure clause as a result of uncertainty with its relationship with Signature Bank, its primary bank, which had recently been shut down and placed into receivership, which Supplybit claimed "significantly imped[ed its] ability to perform [its] necessary treasury functions as well as forecast the potential impact to [its] business operations." Docket No. 61-9 at 1. Two months later, Supplybit again

6

CIVIL NO. 24-1210(JAG)

invoked the force majeure clause, this time due to a "water issue that compromised the integrity of the mining equipment and the data center in Ohio." Docket No. 61 at 7; *see* Docket No. 61-4 at 79; 68 at 10. At that time, the data center in Ohio had been Supplybit's sole functioning mining center. Docket No. 61-4 at 80. Supplybit stopped providing Plaintiff with computing power in August 2023. Docket No. 61-4 at 89. Supplybit was subsequently dissolved in December 2024. Docket Nos. 61-3 at 9-10; 61-5 at 10. It was not until September 2023, when Plaintiff hired the law firm that initiated the present action, that he learned the MSAs could be securities. Docket Nos. 1 at 11, 13; 11 at 16; 68 at 20-21; 68-1 at 3.

## STANDARD OF REVIEW

A motion for summary judgment will be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). A fact is disputed if it could be resolved in favor of either party, and material if it potentially affects the outcome of the case. *Calero-Cerezo v. U.S. Dep't of Justice*, 355 F.3d 6, 19 (1st Cir. 2004) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986)).

The movant bears the burden of showing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "Once the moving party has properly supported [its] motion for summary judgment, the burden shifts to the nonmoving party." *Santiago-Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 52 (1st Cir. 2000) (quoting *DeNovellis v. Shalala*, 124 F.3d 298, 306 (1st Cir. 1997)). The non-movant must demonstrate "through submissions of evidentiary quality [] that a trial worthy issue persists." *Iverson v. City of Bos.*, 452 F.3d 94, 98 (1st Cir. 2006) (citations omitted).

7

CIVIL NO. 24-1210(JAG)

In evaluating a motion for summary judgment, the Court must view the entire record "in the light most hospitable to the party opposing summary judgment, indulging in all reasonable inferences in that party's favor." *Winslow v. Aroostook Cty.*, 736 F.3d 23, 29 (1st Cir. 2013) (quoting *Suarez v. Pueblo Int'l, Inc.*, 229 F.3d 49, 53 (1st Cir. 2000)). The court may safely ignore "conclusory allegations, improbable inferences, and unsupported speculation." *Medina-Rivera v. MVM, Inc.*, 713 F.3d 132, 134 (1st Cir. 2013) (quoting *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990)). The Court cannot make credibility determinations or weigh the evidence, as these are jury functions and not those of a judge. *See Anderson*, 477 U.S. at 255.

## ANALYSIS

### I.    Timeliness

Defendants challenge the timeliness of Plaintiff's action by arguing that the Act "has a strict timeframe in which a purchaser must send a seller notice that it will seek rescission: within 6 months after the purchaser shall have knowledge that the sale of the securities to him or her is voidable. 815 ILL. COMP. STAT. ANN 5/13(B)." Docket No. 67 at 30 (cleaned up). According to Defendants, Plaintiff's "only theory for why his case is timely is that a lawyer told him the MSAs were a security in September 2023. In other words, Gumprecht discovered no new *facts* relating to his December 2021 or December 2022 transactions; he claims only that he learned new law in September 2023." *Id.* Plaintiff counters that Defendants waived this argument because untimeliness is an affirmative defense and Defendants did not include it in their Answer. Docket No. 69 at 21 (cleaned up).

First, Defendants' argument that "Illinois law charges Gumprecht—a licensed attorney— with constructive knowledge of the law," Docket No. 67 at 31, is untenable. Not only do Defendants fail to provide any legal support for this proposition, but Gumprecht does not practice

8

CIVIL NO. 24-1210(JAG)

securities law, which is a highly specialized field, and there is no evidence that he ever worked with securities.

Second, the Court finds that the timeliness argument was not waived because, pursuant to Illinois law, the six-month deadline is not a statute of limitations but an equitable provision and, thus, need not have been asserted in the Answer as an affirmative defense. *See* Docket No. 71 at 7. The Act "is paternalistic in character and therefore its provisions should be liberally construed to protect the investing public from fraud and deceit in the sales of securities." *Norville v. Alton Bigtop Rest., Inc.*, 317 N.E.2d 384, 391 (Ill. App. Ct. 1974) (citations omitted). The Seventh Circuit has found that "[t]he statutory six-month notice is not a statute of limitations, but is an 'equitable feature' to protect against stale claims. The six-month period does not begin until the purchaser is aware that his or her purchase is voidable." *Jacks v. Schneider Sec., Inc.*, 217 F.3d 525, 527 (7th Cir. 2000) (citations omitted).

The Parties agree that Supplybit ceased payments to Plaintiff on March 16, 2023, but that it was not until September 2023 that Plaintiff became aware that the MSAs could be voidable securities contracts. Docket Nos. 1 at 11; 11 at 16; 68 at 20-21; 68-1 at 3 ("The first time [Plaintiff] indicated that belief coincided with him wanting to file a lawsuit against [Groff] and Wes Decatur in [their] individual capacities."); 70 at 7 ("Admitted that the first time he indicated a belief that the MSAs were unregistered securities was after obtaining counsel. Admitted that Gumprecht did not believe the MSAs were securities in June 2023. Admitted that Mr. Gumprecht later hired a law firm that brought this action."); 70-1 at 2. Thus, Plaintiff had six months from that date to request recission. *See Reshal Assocs., Inc. v. Long Grove Trading Co.*, 754 F. Supp. 1226, 1236 (N.D. Ill. 1990) ("Illinois courts have been lenient in their interpretation of what constitutes knowledge of voidability. They have held that the time for notice begins to run not from the time of knowledge

9

CIVIL NO. 24-1210(JAG)

of the underlying facts, but rather from the time of knowledge that those facts give rise to a right of rescission."). The Complaint alleges that, after learning the MSAs might be securities subject to recission, "on September 27, 2023, Gumprecht, through counsel, elected to rescind the MSAs by offering to tender all of the Bitcoin SupplyBit delivered [to] Gumprecht in exchange for all of the money Gumprecht delivered [to] SupplyBit." Docket No. 1 at 13. This notice was well within the six-month period. However, Plaintiff has not provided evidence of this communication. Plaintiff's Complaint was filed on May 8, 2024, more than six months after Plaintiff learned of the potential voidability of the MSAs. Docket No 1. However, considering that the six-month period is not considered a statute of limitations,[4] the Court finds that the approximately two-month delay can be equitably excused.

## II.    Crypto-Currency Mining Contracts

"In this case, the court must navigate uncharted waters as there is scant authority concerning litigation arising from Bitcoin mining packages." *Dettmering v. VBit Techs. Corp.*, Civ. No. 22-1482, 2023 WL 4824955, at *5 (D. Del. July 27, 2023), *report and recommendation adopted*, Civ. No. 22-1482, 2023 WL 6211243 (D. Del. Sept. 25, 2023). Notwithstanding, it is this Court's opinion that while "the 'crypto' nomenclature may be of recent vintage, [ ] the challenged transactions fall comfortably within the framework that courts have used to identify securities for nearly eighty years." *SEC v. Coinbase, Inc.*, 726 F. Supp. 3d 260, 268 (S.D.N.Y. 2024).

The Illinois Securities Act (the "Act") provides private and civil remedies for violations of the law. 815 ILL. COMP. STAT. ANN 5/13. "The purpose of the Act is to protect innocent persons who

---

[4] Defendants themselves argue that their timeliness argument is not waived because the six-month deadline is not a statute of limitations and, thus, did not need to be asserted in the Answer. Docket No. 71 at 7; *see supra*. Defendants cannot have it both ways. They cannot argue that this deadline was not a statute of limitations for purposes of waiver, but that it should be treated as a statute of limitations to find Plaintiff's claims untimely.

CIVIL NO. 24-1210(JAG)

may be induced to invest in speculative enterprises over which they have little control." *Van Dyke v. White*, 131 N.E.3d 511, 523 (Ill. 2019) (citing *Carpenter v. Exelon Enter. Co.*, 927 N.E.2d 768 ( Ill. 2010)).

Specifically, the Act provides as follows:

> Every sale of a security made in violation of the provisions of this Act shall be voidable at the election of the purchaser . . . and the issuer, controlling person, underwriter, dealer or other person by or on behalf of whom said sale was made, and each underwriter, dealer, internet portal, or salesperson who shall have participated or aided in any way in making the sale, and in case the issuer, controlling person, underwriter, dealer, or internet portal is a corporation or unincorporated association or organization, each of its officers and directors (or persons performing similar functions) who shall have participated or aided in making the sale, shall be jointly and severally liable to the purchaser as follows:
>
>> **(1)** for the full amount paid, together with interest from the date of payment for the securities sold at the rate of the interest or dividend stipulated in the securities sold (or if no rate is stipulated, then at the rate of 10% per annum) less any income or other amounts received by the purchaser on the securities, upon offer to tender to the seller or tender into court of the securities sold or, where the securities were not received, of any contract made in respect of the sale[.]

815 ILL. COMP. STAT. ANN 5/13. Under the Act, investment contracts are defined as securities subject to the provisions of the Act. 815 ILL. COMP. STAT. ANN 5/2.1. "To effectuate the Act's paternalistic goals, it should be given a liberal construction, and courts construe the term 'security' broadly." *Van Dyke*, 131 N.E.3d at 523. As Illinois securities law closely mirrors federal security law, the Court—following the path laid by Illinois courts—looks to federal securities jurisprudence to assist in interpreting the scope of the Act. *See Tirapelli v. Advanced Equities, Inc.*, 813 N.E.2d 1138, 1142 (Ill. 2004); *see also Falk v. N. Tr. Co.*, 763 N.E.2d 380, 385 (Ill. 2001) (citation omitted).

Federal securities jurisprudence provides:

CIVIL NO. 24-1210(JAG)

> The primary purpose of the Acts of 1933 and 1934 was to eliminate serious abuses in a largely unregulated securities market. The focus of the Acts is on the capital market of the enterprise system: the sale of securities to raise capital for profit-making purposes, the exchanges on which securities are traded, and the need for regulation to prevent fraud and to protect the interest of investors. Because securities transactions are economic in character Congress intended the application of these statutes to turn on the economic realities underlying a transaction, and not on the name appended thereto. Thus, in construing these Acts against the background of their purpose, we are guided by a traditional canon of statutory construction: "[A] thing may be within the letter of the statute and yet not within the statute, because not within its spirit, nor within the intention of its makers."

*United Hous. Found., Inc. v. Forman*, 421 U.S. 837, 849 (1975) (citations omitted). "The touchstone of an investment contract for purposes of the Securities Acts is the presence of an investment in a common venture premised on a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others." *SEC v. Unique Fin. Concepts, Inc.*, 196 F.3d 1195, 1201 (11th Cir. 1999) (cleaned up). The Supreme Court established this seminal test in *Sec. v. W.J. Howey, Co.*, 328 U.S. 293, 301 (1946), to determine when a contractual arrangement is an investment contract under federal securities law. "[T]he test for an investment contract under the Securities Act is whether the scheme involves (1) an investment of money[5][,] (2) in a common enterprise[,] (3) with profits to come solely from the efforts of others." *SEC v. LBRY, Inc.*, 26 F.4th 96, 98 n.2 (1st Cir. 2022) (cleaned up).

Whether an instrument is considered an investment contract is to be determined under a broad construction, which "embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the

---

[5] "The investment of 'money' includes the investment of anything of value such as property or services. It seems clear that crypto currency involves an upfront investment of money or something of value." Thomas Lee Hazen, *Tulips, Oranges, Worms, and Coins – Virtual, Digital, or Crypto Currency and the Securities Laws*, 20 N.C. J.L. & TECH. 493, 503 (2019).

CIVIL NO. 24-1210(JAG)

money of others on the promise of profits." *Howey*, 328 U.S. at 298-99. Under Illinois securities law, this determination is a question of law. *Integrated Rsch. Servs. v. Ill. Sec'y of State*, 765 N.E.2d 130, 134 (Ill. 2002). Courts are to favor substance over form "and the emphasis should be on economic reality." *Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967) (citing *Howey*, 328 U.S.C. at 298). The Supreme Court has stated that

> [T]he reach of [federal securities law] does not stop with the obvious and commonplace. Novel, uncommon, or irregular devices, whatever they appear to be, are also reached if it be proved as matter of fact that they were widely offered or dealt in under terms or courses of dealing which established their character in commerce as investment contracts, or as any interest or instrument commonly known as a security.

*SEC v. C. M. Joiner Leasing Corp.*, 320 U.S. 344, 351 (1943) (cleaned up). Furthermore, courts can look outside the four corners of the instrument when evaluating its nature. *Id.* at 355.

The Strategic Hub for Innovation and Financial Technology of the U.S. Securities and Exchange Commission ("SEC") "provide[s] a framework for analyzing whether a digital asset is an investment contract and whether offers and sales of a digital asset are securities transactions." SEC DIVISION OF CORPORATE FINANCE, *Framework for "Investment Contract" Analysis of Digital Assets*, https://www.sec.gov/about/divisions-offices/division-corporation-finance/framework-investment-contract-analysis-digital-assets#_edn1 [https://perma.cc/NE33-5R97]. "In this framework, the SEC essentially provided a gloss on the *Howey* test that applied the *Howey* analysis to crypto-assets." *In re Bibox Grp. Holdings Ltd. Sec. Litig.*, 534 F. Supp. 3d 326, 332-33 (S.D.N.Y. 2021). This framework states that

> When a promoter, sponsor, or other third party (or affiliated group of third parties) (each, an "Active Participant" or "AP") provides essential managerial efforts that affect the success of the enterprise, and investors reasonably expect to derive profit from those efforts, then this prong of the test is met. Relevant to this inquiry is the "economic reality" of the transaction and "what character the instrument is given in commerce by the terms of the offer, the plan of distribution, and the economic inducements held out to the prospect." The inquiry, therefore, is

13

CIVIL NO. 24-1210(JAG)

an objective one, focused on the transaction itself and the manner in which the digital asset is offered and sold.

SEC DIVISION OF CORPORATE FINANCE, *supra* (citing *Howey*, 328 U.S. at 298; and *C. M. Joiner Leasing Corp.*, 320 U.S. at 352-53); *see also Coinbase, Inc.*, 726 F. Supp. 3d at 289 ("[W]hen conducting the *Howey* analysis, courts are not to consider the crypto-asset in isolation. Instead, courts evaluate whether the crypto-assets and the full set of contracts, expectations, and understandings surrounding its sale and distribution—frequently referred to using the shorthand 'ecosystem'—amount to an investment contract.") (cleaned up). The above-referenced guidance further notes that "usually, the main issue in analyzing a digital asset under the *Howey* test is whether a purchaser has a reasonable expectation of profits (or other financial returns) derived from the efforts of others." *Id.*

Because Defendants do not contest that there was an investment of money and that Plaintiff had an expectation of profits,[6] the Court shall first address whether Plaintiff's investment was for the purpose of a common enterprise and then whether the profits earned were derived from the efforts of third parties.

## III.    Common Enterprise

Under Illinois law, a common enterprise is present when an investment possesses either horizontal or vertical commonality. *See Integrated Rsch. Servs., Inc.*, 765 N.E.2d at 135. Horizontal commonality exists "when there is a linkage between the fortunes of individual investors and other investors by reason of the entire venture's success or failure." *Ronnett v. Am. Breeding Herds, Inc.*, 464 N.E.2d 1201, 1204 (Ill. 1984). Vertical commonality is found "when the investor's fortunes are interwoven with and dependent upon the success of the promoter." *Id.* (citations omitted).

---

[6] *See* Docket No. 34 at 1; *see also supra* n.6.

14

CIVIL NO. 24-1210(JAG)

The MSAs in this case gave clients the right to receive "True-Up Amounts," which "refers to the amount of crypto currency that should have been produced, but wasn't produced due to a computer or other technical failure on Supplybit's part." Docket No. 68 at 8 (citing Docket No. 61-10, §§ 1.52, 1.56). Supplybit offered 100% uptime. Docket No. 61-3 at 102 ("In the contract, [Supplybit] offered 100 percent uptime. What that means is if there was an outage on the Supplybit side, [Supplybit] would compensate the clients for the downtime within the parameters of the MSA."). Therefore, "if for whatever reason there was hash rate that went offline for a client, [Supplybit] would go back, historically calculate what the client should have earned due to the downtime, and compensate them accordingly." *Id.* at 105-06. Defendants admit that "Supplybit furnished True-Up payments to investors through its normal operations, crypto assets it mined itself, cash from Supplybit's books, and other payments that Supplybit received." Docket No. 61 at 7; *see also* Docket Nos. 68 at 9; 61-5 at 45-46. The nature of the True-Up provisions, thus, establishes an expectation of continuous profits and Supplybit's ability to guarantee these profits—when the theoretical earnings for the cryptocurrency exceed the mining proceeds from a given day—was dependent on Supplybit's financial success. Because True-Up payments could only be made if Supplybit continued to be profitable, the Court finds that vertical commonality is present.[7]

## IV. Efforts of Others

Since *Howey*, courts have "have rejected a literal interpretation of 'solely' because it would frustrate the remedial purposes of the securities law." *Integrated Rsch. Servs., Inc.*, 765 N.E.2d at 136; *see also Lino v. City Investing Co.*, 487 F.2d 689, 692-93 (3d Cir. 1973) ("The reasoning of the Supreme

---

[7] Because the Court finds that vertical commonality exists, it need not determine whether horizontal commonality also exists.

CIVIL NO. 24-1210(JAG)

Court, the Ninth Circuit, the S.E.C.[,] and Supreme Court of Hawaii leads us to hold that an investment contract can exist where the investor is required to perform some duties, as long as they are nominal or limited and would have little direct effect upon receipt by the participant of the benefits promised by the promoters.") (cleaned up). Instead, the Court centers its analysis on whether "efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise." *Integrated Research Servs.*, 765 N.E.2d at 136 (cleaned up). The "efforts of others" prong "is met where the investor exerts little to no control of the enterprise. *Id.* (citation omitted). "[E]mphasis is placed on the economic reality of each situation presented." *Ronnett*, 464 N.E.2d at 1203 (citations omitted). The Securities Act of 1933 Release No. 5211 (November 30, 1971) states:

> It must be emphasized that the assignment of nominal or limited responsibilities to the participant does not negative the existence of an investment contract; where the duties assigned are so narrowly circumscribed as to involve little real choice of action or where the duties assigned would in any event have little direct effect upon receipt by the participant of the benefits promised by the promoters, a security may be found to exist. As the Supreme Court has held, emphasis must be placed upon economic reality.

*Mitzner v. Cardet Int'l, Inc.*, 358 F. Supp. 1262, 1267 (N.D. Ill. 1973); *see also Steinhardt Grp. v. Citicorp*, 126 F.3d 144, 152 (3d Cir. 1997) ("Our sister court in the fifth circuit noted that [the efforts made by others] inquiry comported with the position adopted by the SEC [in the Securities Act of 1933 Release No. 5211].") (cleaned up); *Frederiksen v. Poloway*, 637 F.2d 1147, 1153 (7th Cir. 1981) ("[T]he test for determining whether the reliance element has been met is whether the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise.") (cleaned up).

Defendants argue that, under the MSAs, Plaintiff enjoyed a great latitude of control over his investment because "he could choose when to mine or to pause, depending on his reading of

16

CIVIL NO. 24-1210(JAG)

market conditions; he could choose which cryptocurrency to mine; [and] he could find his own mining equipment and send it to Supplybit to supplement his mining power." Docket No. 67 at 6. Defendants thus argue that Plaintiff was free to make individual decisions under the MSAs for his sole benefit and as a result "his Client Wallet went up or down based on his decisions, independently of any other Client's performance or Supplybit's overall performance." *Id.* Nonetheless, the MSAs were drafted in a manner that customers need not make any affirmative investment decisions; they were designed to implement a default mining strategy if the client issued no instructions to the contrary. *See* Docket Nos. 61-10, §§ 3.01(d), (e); 61-11, §§ 3.01(d), (e).

Defendants' claim that "the MSAs reserved these decisions for the Client, not Supplybit," Docket No. 67 at 10, is "inconsistent with the broad authority given to [Supplybit] in the [MSAs] signed by each [client.]" *Integrated Research Servs.*, 765 N.E.2d at 137. Both MSAs provide as follows:

> Client acknowledges and agrees that it shall have no right to specific performance under this Agreement such as might compel Supplybit to operate any particular Miners in any particular fashion or to deploy any particular amount of Mining Power, Client's rights under this Agreement instead being limited to its receipt of Mining Proceeds and True-Up Amounts as set forth herein.

Docket Nos. 61-10, § 3.02(b); 61-11, § 3.02(b). The MSAs provide Supplybit expansive control over its clients' investments and the ability to essentially veto client instructions. *See* Docket Nos. 61-10, § 3.01(g) ("Client acknowledges and agrees that Supplybit may, within reason, adjust the precise Mining Power thus directed toward the Client Wallet . . . ."); *id.* § 3.01(j) ("Client acknowledges and agrees that Supplybit may apply reasonable adjustments to instructions received from Client, including but not limited to reallocating Mining Power to the mining of a different Cryptocurrency than Client originally requested, to the extent required, as determined by Supplybit in its reasonable discretion . . . ."); *id.* § 3.02(b) ("Client acknowledges and agrees that Supplybit may exercise its reasonable discretion in deciding which kinds of Miners to

17

CIVIL NO. 24-1210(JAG)

operate, and where, when, and how to operate them, in advancement of the Purpose. Client also acknowledges and agrees that Supplybit, in its sole discretion, may select which particular Miners to utilize when allocating Mining Power to Client in fulfillment of Section 3.01(f) . . . .”). Moreover, nothing in the record indicates that Plaintiff, or any Supplybit client for that matter, made any affirmative investment decisions other than relying on Supplybit to execute the default options in the MSAs.

Defendants also cite the SEC’s Statement on Certain Proof-of-Work Mining Activities to argue that mining pools are not investment contracts or securities. Docket No. 67 at 23. This SEC Statement posits that

> [W]hen a miner combines its computational resources with other miners to increase their chances of successfully mining new blocks on the network, the miner has no expectation of profit derived from the entrepreneurial or managerial efforts of others. By adding its own computational resources to a mining pool, the miner merely is engaging in an administrative or ministerial activity to secure the network, validate transactions and add new blocks, and receive Rewards.

SEC DIVISION OF CORPORATE FINANCE, *Statement on Certain Proof-of-Work Mining Activities*, https://www.sec.gov/newsroom/speeches-statements/statement-certain-proof-work-mining-activities-032025 [https://perma.cc/KS7E-PQA3]. But this is not what happened in this case. This case does not present a situation where a group of experienced miners combine computational resources to better their mining profits. The MSAs were sold to the general public, not experienced miners. *See SEC v. Shields*, 744 F.3d 633, 647 (10th Cir. 2014) (“[A]n investment scheme which sells investments to inexperienced and unknowledgeable members of the general public cannot escape the reach of the securities laws merely by labeling itself a general partnership or joint venture. The experience and knowledge referred to in *Williamson* focus[es] on the experience of investors in the particular business, not the general business experience of the partners. This is so because [r]egardless of investors’ general business expertise, where they are inexperienced in a

18

CIVIL NO. 24-1210(JAG)

particular business, they are likely to be relying solely on the efforts of the promoters to obtain their profits.") (cleaned up); *United States v. Leonard*, 529 F.3d 83, 90 (2d Cir. 2008) ("We echo the Fifth Circuit in finding that investors may be so lacking in requisite expertise, so numerous, or so dispersed that they become utterly dependent on centralized management, counteracting a legal right of control."); *see also Koch v. Hankins*, 928 F.2d 1471, 1480-81 (9th Cir. 1991); *Reeves v. Teuscher*, 881 F.2d 1495, 1499-500 (9th Cir. 1989) ("We have held that a general partnership interest . . . may be a security if a manager's or promoter's efforts are the undeniably significant ones. In this situation, [t]he proper focus must be the partnership agreement and not how in fact the entity functioned in carrying out its business affairs.") (cleaned up). Clients might know which cryptocurrency is rising in value but not possess the skill and knowledge necessary to operate a miner.[8] This lack of knowledge and experience is precisely the need Supplybit seeks to meet, and the motivation behind a client entering into the an MSA. Otherwise, Supplybit's clients would simply operate their own miners, without third-party assistance. They were relying on Supplybit's expertise to obtain profits through cryptocurrency mining.[9]

The fact that the MSAs include a Trade-In Miner provision, a legal right that was scarcely exercised,[10] does not provide a sufficient shift in control towards the clients so as to take the MSAs

---

[8] "In recent years, crypto networks have grown in size and complexity, making crypto mining an increasingly computational-intensive task. As a result, crypto miners use powerful mining hardware, such as GPUs, to perform their mining." *E. Ohman J:or Fonder AB v. NVIDIA Corp.*, 81 F.4th 918, 924 (9th Cir. 2023).

[9] "The Supreme Court itself has clarified that when [it] held that profits must come solely from the efforts of others, [it] w[as] speaking of the profits that investors seek on their investment, not the profits of the scheme in which they invest. In this way, the Supreme Court used profits in the sense of income or return, to include, for example, dividends, other periodic payments, *or the increased value of the investment*." *Coinbase, Inc.*, 726 F. Supp. 3d at 291 (cleaned up).

[10] Defendant Gross testified that Supplybit entered into "several" Trade-In Miner agreements during the life of the company. Docket No. 61-3 at 22. He could not recall the exact number of such agreements, but stated that it was "greater than five." *Id.* Around the time the force majeure clauses were invoked in early 2023, Supplybit had "200-and-some clients [and] 400-and-some plus contracts." Docket No. 61-6 at 21-23.

CIVIL NO. 24-1210(JAG)

out of the realm of an investment instrument. Thus, the Court is unpersuaded by Defendants' argument that the numerous references to Trade-In Miners in the MSAs show that these provisions were "part of the core transaction contemplated by the MSA." Docket No. 67 at 11. The overall structure of the MSAs was such that clients did not take active control of their investments because they did not need to and, at most, engaged in ministerial duties. The MSAs require no actions and impose no responsibilities on clients beyond the financial contribution. Ultimately, the MSAs paint a picture in which clients have "minimal control over the enterprise [and, thus,] the third prong of the *Howey* test is satisfied." *Integrated Rsch. Servs., Inc.*, 765 N.E.2d at 137. Accordingly, the Court finds that the MSAs are securities subject to the Act.

## V. Defendant Decatur

Defendants also argue that the claims against Defendant Decatur should be dismissed because Plaintiff has failed to establish individual liability under the Act. Docket No. 67 at 29-30. The Court agrees.

The Act provides that "in case the issuer, controlling person, underwriter, dealer, or internet portal is a corporation or unincorporated association or organization, each of its officers and directors (or persons performing similar functions) who shall have participated or aided in making the sale, shall be jointly and severally liable to the purchaser." 815 ILL. COMP. STAT. ANN. 5/13(A). Here, the MSAs were issued by Supplybit, a limited liability company. Docket Nos. 61 at 3; 61-12 at 3; 68 at 2. Decatur was Supplybit's Chief Financial Officer and Managing Director. Docket Nos. 61 at 3; 61-12 at 4; 68 at 2. Defendants argue that Plaintiff has not provided sufficient evidence that Decatur participated or aided in making the sale of the MSAs to Plaintiff. Docket

20

CIVIL NO. 24-1210(JAG)

No. 67 at 28 ("In his complaint,[11] Gumprecht pled a single theory for why Decatur would [face individual liability]; Gumprecht alleged that Decatur directly aided in making an illegal sale by, among other things, soliciting Gumprecht's purchase. Notably, Gumprecht did not attempt to support that allegation with a single fact. His statement of facts says nothing about Decatur soliciting him, directly or indirectly.") (cleaned up). Plaintiff's statement of facts does say that "[b]oth Groff and Decatur developed the MSA" and that "Decatur emailed Gumprecht to confirm Supplybit's receipt of Gumprecht's payment" after Plaintiff signed the first MSA." Docket Nos. 61 at 4, 8; 68 at 4, 10. However, Plaintiff has not put forth any evidence showing that Decatur participated or aided in signing Plaintiff as a Supplybit client and has, thus, failed to show that Decatur is subject to individual liability under the Act. Consequently, the claims against Decatur must be **DISMISSED WITH PREJUDICE**.[12]

---

[11] *See* Docket No. 1 at 3 ("By information and belief, Wesley Decatur [is] the CFO of SupplyBit."); *id.* at 10 ("Groff and Decatur personally solicited Gumprecht's purchase of the MSAs during virtual meetings between Gumprecht and Groff on November 10, 2021, December 14, 2021, and September 21, 2022, and several email exchanges with Decatur, including a December 12, 2022, email (and one the prior year) in which Decatur confirms Gumprecht's purchase and sends him an invoice to 'lock in' his purchase of the MSA."); *id.* at 15 ("Decatur is a director and officer of the company and he directly aided in making an illegal sale by, among other things, soliciting Gumprecht's purchase."). Plaintiff provided no evidence to support these allegations.

[12] Defendants also argue that Plaintiff suffered no damages and that a full recission would constitute an inappropriate windfall. Docket No. 67 at 32-33. Defendants, without providing legal support, posit that "[i]f someone is aggrieved under the Securities Act, they can rescind the transaction, and get back what they paid *minus* the gain they are keeping." *Id.* Notwithstanding, the Illinois Supreme Court has held that "the statute compensates the investor for the return on investment stated in the purchased securities. If no rate is stipulated, the default rate is 10 percent. The plain language of the statute indicates intent to compensate investors for their lost return and to make the investor whole." *Goldfine v. Barack, Ferrazzano, Kirschbaum & Perlman*, 18 N.E.3d 884, 894 (Ill. 2014). Thus, damages encompass the initial investment and the lost return, i.e. the Bitcoin not mined. Therefore, the Court finds that Plaintiff is not seeking an impermissible windfall but is merely seeking damages provided under the statute.

21

CIVIL NO. 24-1210(JAG)

## CONCLUSION

For the reasons stated in this Opinion and Order, Plaintiff's Motion for Summary Judgment is **GRANTED IN PART** and **DENIED IN PART**. The Court finds that the MSAs constitute unregistered securities under the Act and are thus voidable pursuant to 815 ILL. COMP. STAT. ANN 5/13. Consequently, Plaintiff is entitled to recission of the MSAs. To determine the amount of damages, interests, costs, and attorney fees, the matter shall be referred to a U.S. Magistrate Judge for a hearing and a Report & Recommendation once the Parties have briefed the matter. Defendants' Cross-Motion for Summary Judgment is **GRANTED IN PART** and **DENIED IN PART**. The arguments therein are **DENIED** except for the arguments regarding Defendant Decatur's individual liability and, thus, the claims against Defendant Decatur are hereby **DISMISSED WITH PREJUDICE**.

IT IS SO ORDERED.

In San Juan, Puerto Rico, this Monday, March 23, 2026.

s/ Jay A. Garcia-Gregory<br>
JAY A. GARCIA-GREGORY<br>
United States District Judge